UNITED STATES of America,
Appellee,

v.

Thomas ZICHETTELLO, Defendant,

Frank Richardone, Ronald Reale, Richard Hartman, James J. Lysaght, and Peter Kramer, Defendants–Appellants.

Docket Nos. 98–1376(L), 98–1377, 98–1378, 98–1379, 98–1380.

United States Court of Appeals,
Second Circuit.

Argued June 8, 1999

Decided March 30, 2000

Michele Hirshman, Special Assistant United States Attorney, and Christine H. Chung, Assistant United States Attorney (Mary Jo White, United States Attorney for the Southern District of New York, Ping C. Moy, Michael S. Schachter, Alexandra A.E. Shapiro, Lewis J. Liman, Assistant United States Attorneys, of counsel), New York, New York, for Appellee.

Terrance G. Reed, Reed & Hostage, P.C. (Christopher A. Hostage, of counsel), Washington, D.C., for Defendants–Appellants Richard Hartman, James J. Lysaght, and Peter Kramer.

Barry D. Leiwant, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, for Defendant–Appellant Ronald Reale.

Martin B. Adelman, New York, New York, for Defendant–Appellant Frank Richardone.

Before: WINTER, Chief Judge, OAKES, and SACK, Circuit Judges.

Judge OAKES dissents in a separate opinion.

WINTER, Chief Judge:

Following a three and one-half month jury trial before Judge Batts, Ronald Reale, the former President of the New York City Transit Police Benevolent Association ("TPBA"), Richard Hartman, a disbarred lawyer who was the TPBA's former labor negotiator and insurance broker, and James J. Lysaght and Peter Kramer, partners in the law firm Lysaght, Lysaght and Kramer ("LL & K"), who received millions of dollars in legal fees from the TPBA in return for kickbacks, appeal from their convictions and sentences. These appellants were convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962, for their role in corrupting the TPBA and transforming it into a RICO enterprise through bribery and other illegal acts. Reale and Hartman were also convicted of various substantive offenses. Frank Richardone, a former Treasurer of the TPBA, pleaded guilty to mail fraud and related crimes. Richardone appeals only from his sentence. (For convenience purposes, "appellants" will refer only to

the defendants who went to trial unless otherwise specified.)

This appeal involves a unique set of circumstances. Appellants' opening briefs advanced substantial claims of error based on instructions to the jury concerning aiding and abetting that were found in the official trial transcript. In its brief, the government responded by arguing that the instructions were not error or at least not reversible error. The government thereafter moved this court pursuant to Rule 10(e)(2), see Fed. R.App. P. 10(e)(2), to amend the portion of the trial transcript containing the challenged instructions. The motion was based on evidence that the transcript originally prepared by the court reporter was altered by someone in the district judge's chambers to conform to what was believed to be the version actually read to the jury. We conclude that the trial court committed no reversible error in the unusually lengthy, difficult and complex RICO conspiracy trial that is the subject of this appeal, although we must take a long and arduous detour to arrive at that result. For the reasons set forth below, the government's motion is granted. Because we reject appellants' remaining arguments on appeal, we affirm.

## BACKGROUND

a) *The Charges*

Given the number of defendants and charges against them, we are obliged to describe those charges at length, although the reader may prefer to skip this section and use it for reference only where needed.

On September 15, 1997, the government filed a thirty-nine count indictment, S5 96 Cr. 1069(DAB), against Reale, Hartman, Lysaght, and Kramer.[1] Counts One and Two charged them with participating and conspiring to participate in the affairs of the TPBA through a pattern of racketeering in violation of 18 U.S.C. §§ 1962(c) & (d). These counts also alleged that the appellants had committed eleven racketeering acts in furtherance of the charged enterprise, including bribery, mail fraud, wire fraud, money laundering, and witness tampering.

Counts Three through Nineteen charged the appellants with crimes relating to the alleged racketeering acts. Count Three charged them with conspiring to defraud the Internal Revenue Service in connection with the filing of false individual tax returns by three TPBA officers—Reale, Thomas Zichettello, a former TPBA First Vice–President, and Raymond Montoro, a former TPBA Treasurer (sometimes the "TPBA Officers")—in violation of 18 U.S.C. § 371. Counts Four through Eight charged Reale with tax evasion, in violation of 26 U.S.C. § 7201. Counts Nine and Ten charged appellants with mail fraud in connection with monthly bribes of approximately $1,800 and quarterly bribes of approximately $18,000 that Hartman, Lysaght, and Kramer paid to the TPBA Officers during certain time periods, in violation of 18 U.S.C. §§ 1341, 1346, and 2. Count Eleven charged Reale and Hartman with wire fraud in connection with a kickback Hartman paid to the TPBA Officers in connection with Hartman's designation by the TPBA as broker to sell whole life insurance policies issued by the Metropolitan Life Insurance Company ("Metlife") to TPBA members, in violation of 18 U.S.C. §§ 1343, 1346, and 2. Counts Twelve through Fourteen charged Reale with mail fraud related to bribes paid to the TPBA Officers by the partners of the law firm Agulnick & Gogel ("A & G"), in violation of 18 U.S.C. §§ 1341, 1346, and 2. Count Fifteen charged Reale and Hartman with conspiracy in connection with a fraudulent

---

1. The original indictment was filed against Richardone and Thomas Zichettello. Thereafter, Zichettello entered into a cooperation agreement with the government pursuant to which he pleaded guilty to charges of participating in a RICO enterprise and committing tax evasion. Richardone also pleaded guilty but did not enter into a cooperation agreement with the government.

scheme to obtain matching campaign funds from the New York City Campaign Finance Board ("NYCCFB") for Reale's 1993 campaign to win the Democratic nomination for New York City's Public Advocate, in violation of 18 U.S.C. § 371. Count Sixteen charged Reale and Hartman, and Count Seventeen charged Reale, with wire fraud in connection with the campaign finance scheme, in violation of 18 U.S.C. §§ 1343 and 2. Count Eighteen charged Reale with money laundering in connection with the campaign finance scheme, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Count Nineteen charged Reale with witness tampering, in violation of 18 U.S.C. §§ 1512(b)(3) and 2.

Counts Twenty through Thirty–Nine charged Hartman and Kramer with conspiracy and substantive tax offenses related to the operation of Hartman's insurance brokerage business and its transfer to a partnership owned by Lysaght's and Kramer's spouses, in violation of 18 U.S.C. §§ 371 and 2, and 26 U.S.C. §§ 7201, 7206(1), 7206(2), and 7206(5).

Prior to trial, the district court severed Counts Twelve through Fourteen, which related to bribes A & G paid Reale, and the corresponding racketeering acts—Racketeering Acts Six through Eight of Counts One and Two. See *United States v. Reale*, No. S4 96 CR. 1069, 1997 WL 580778, at *11 (S.D.N.Y. Sept.17, 1997). The district court also severed Counts Twenty through Thirty–Nine, the tax offenses arising from the transfer of Hartman's insurance business. See *id.* at *13.

At the close of the government's case, it voluntarily dismissed Racketeering Act One, which related to monthly $1,800 bribes paid by Hartman, Lysaght, and Kramer to Reale, but only insofar as it named Lysaght. The government also voluntarily dismissed Racketeering Act Three, which charged that Hartman, Lysaght, and Kramer had paid a $100,000

bribe to Reale in connection with the life insurance scheme. On appellants' Rule 29 motions, *see* Fed.R.Crim.P. 29, the district court dismissed Count One—the substantive RICO charge—against Hartman, Lysaght, and Kramer, but not Reale. The district court also dismissed Counts Three, Nine, Ten, Eleven, Seventeen, and Eighteen, and Racketeering Act Ten, which charged Reale with having committed wire fraud and money laundering in connection with the campaign finance scheme.

The redacted and renumbered indictment[2] submitted to the jury contained ten counts. Count One charged Reale with Racketeering from 1990–1996 in violation of 18 U.S.C. § 1962(c). Count Two charged Reale, Hartman, Lysaght, and Kramer with Racketeering Conspiracy from 1990 to 1996 in violation of 18 U.S.C. § 1962(d). The indictment specified six Racketeering Acts: (i) monthly $1,800 cash bribes paid by Hartman and Kramer and received by Reale; (ii) receipt and payment in early 1992 of a $150,000 cash bribe in connection with a $750,000 payment by the TPBA to LL & K; (iii) receipt and payment of quarterly $18,000 cash bribes in 1993 and 1994; (iv) receipt and payment of a bribe arising out of the life insurance scheme, against Reale and Hartman; (v) wire fraud in connection with the campaign finance scheme, against Reale and Hartman; and (vi) tampering with a witness during a federal investigation, against Reale. Counts Three through Seven charged Reale with tax evasion. Counts Eight and Nine charged Reale and Hartman with wire fraud conspiracy and wire fraud in connection with the campaign finance scheme. Finally, Count Ten charged Reale with witness tampering.

b) *Evidence at Trial*

At all pertinent times, the TPBA was a labor union that represented, in collective

---

**2.** Hereafter, unless otherwise noted, references to the "indictment" refer to the indictment used at trial.

bargaining with the City, approximately 3,000 transit police officers employed by the New York City Transit Authority ("NYCTA"). The TPBA was also responsible for administering certain pension and health and welfare benefit funds for members or retirees. The TPBA's operating expenses were paid from a general fund that was financed primarily by members' dues and that, under the TPBA's bylaws, could be used only for legitimate expenses in the course of TPBA's business.

The government showed that Reale, together with Hartman, Lysaght, and Kramer, used the TPBA as a piggy-bank available to enrich themselves almost at will and to aid Reale's campaign for Public Advocate (the "Reale Campaign"). The evidence offered by the government included the testimony of Montoro,[3] a former TPBA Treasurer, of Zichettello, a former TPBA First Vice–President, and of more than a dozen corroborating witnesses; and thousands of financial and other documents.

Viewed in the light most favorable to the government, see *United States v. Joyner*, 201 F.3d 61, 67 (2d Cir.2000) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)), the evidence demonstrated that: (i) between 1990 and 1994, Hartman, Lysaght, and Kramer paid the TPBA Officers more than $400,-000 in cash bribes in exchange for the TPBA's paying to LL & K more than $2 million in legal and consulting fees; (ii) Hartman paid bribes to the TPBA Officers so that he could be named the "broker of record" to sell whole life insurance policies to TPBA members; and (iii) in 1993, during the Reale Campaign, Reale used TPBA funds to pay campaign expenses and both Reale and Hartman were involved in schemes whereby they paid individuals to make sham contributions totaling tens of thousands of dollars to the campaign so

that Reale could obtain matching funds from the New York City Campaign Finance Board ("NYCCFB"). A more detailed description of the evidence against the appellants follows.

### 1) Bribes and Kickbacks Paid by Lysaght and Kramer

Before Reale became President of the TPBA in 1989, the law firm Agulnick & Gogel ("A & G") served as its general counsel. However, Zichettello, as TPBA First Vice–President in the Reale administration, sought new attorneys. In the course of his search, Zichettello met Hartman, a disbarred lawyer who was a labor negotiator for several law enforcement unions in Nassau and Suffolk counties in New York. Hartman offered to provide labor negotiation services to the TPBA, quoting a fee that amounted to $100 per member and recommending LL & K to Zichettello as new legal counsel. LL & K was the law firm into which Hartman's legal practice merged when he was disbarred. Hartman told Zichettello that LL & K could represent transit police officers who were sued for conduct in the line of duty if and when the NYCTA declined to represent such officers.

### A. Civil Legal Defense Fund

When Reale campaigned to be TPBA's President in 1989, he promised to restore the Civil Legal Defense Fund ("CLDF"), a fund that previously existed to pay for the representation of officers sued civilly for work-related conduct. In the contract negotiations immediately preceding Reale's 1989 TPBA campaign, the TPBA sought other benefits in exchange for giving up NYCTA's financial support for a CLDF. The TPBA could safely do so because the NYCTA had apparently never declined to provide representation to officers sued in such circumstances, and the need for a

---

**3.** Pursuant to a cooperation agreement with the government, Montoro pleaded guilty to an information charging conspiracy to commit mail fraud and obstruction of justice in connection with the campaign finance scheme, and conspiracy to commit mail fraud in connection with his taking bribes.

fund to provide such representation was therefore minimal to non-existent.

As a result, the CLDF did not exist during the 1987–1990 contract period, but Reale, who saw a profitable use for it, promised to bring it back if elected. After Reale's election, Zichettello and Hartman signed a contract providing that if the NYCTA reestablished the CLDF, LL & K would receive a fee of $50 per officer annually for legal representation pursuant to the CLDF. Any CLDF amount in excess of $50 per member paid by the NYCTA to the CLDF would be retained by the TPBA. At approximately the same time, Reale authorized and made a $314,000 prepayment to LL & K for CLDF-related services even though the NYCTA had not yet agreed to restore the CLDF.

In 1990, Lysaght and Kramer assigned an associate at their firm to monitor civil lawsuits against transit police officers for actions in the course of their employment. They did this presumably to create the appearance of valuable services being rendered in return for the $314,000. The monitoring consisted of obtaining documents filed in such lawsuits, filing them, and sending form letters to the officers involved in the cases advising them of the existence and nature of the lawsuit. There was no heavy legal lifting, however, and, from 1990 until November 1991, LL & K never actually represented any transit officer for the CLDF. Nevertheless, restoring the CLDF was a key provision of the contract that Lysaght and Hartman negotiated on behalf of the TPBA with New York City in late 1991 and early 1992. As a result of those negotiations, the TPBA allocated approximately $840,000 of credit to the CLDF, representing payments retroactive to 1987. Reale promised the TPBA membership to use this money as a "reserve" for the future.

Reale advised Montoro and Zichettello about the upcoming receipt of a large sum of money representing the retroactive CLDF payment. Reale and Hartman agreed that $750,000 of that payment was

to be paid to LL & K and that Reale, Montoro, and Zichettello would receive $150,000 cash in return. The TPBA received $840,482.42 on March 11, 1992, and, shortly thereafter, Reale, Montoro, and Zichettello met with Kramer and gave him a $750,000 check. Kramer in turn gave them a large envelope stuffed with slightly under $150,000 in cash. Lysaght's and Kramer's bank records corroborated the testimony of Montoro and Zichettello regarding the $150,000 kickback.

Some time later, Hartman presented the TPBA Officers with a back-dated agreement between LL & K and the TPBA to portray the $750,000 payment as a legitimate fee. The new back-dated retainer agreement provided that LL & K would receive $75 per member—an increase of $25 over the original agreement—for CLDF services as of July 1990.

In August 1992, Hartman came to the TPBA offices and demanded that Montoro make an immediate payment to LL & K of an additional $150,000—money allegedly due under the terms of the back-dated agreement. Montoro issued two checks totaling $150,000 for CLDF-related services. Because the CLDF fund had been reduced to only $70,000, Montoro was forced to take money from the TPBA's general fund to make the payment.

## B. LL & K's Monthly Bribes to TPBA Officers

In 1990, at the end of the first year of Reale's presidency, the TPBA retained LL & K for $40,000 annually to replace A & G as legal counsel to a number of health and welfare benefit funds. By February 1991, Hartman was earning approximately $14,000 a month in labor relation and consulting fees from the TPBA. Thereafter, Hartman informed the TPBA that he would no longer perform labor negotiation services and requested that the TPBA retain LL & K to replace him. Reale, Zichettello, and Montoro agreed, and the TPBA began paying LL & K the monthly fees that

Hartman had been receiving. Several months later, Reale and Hartman advised Montoro that the labor consulting fees were going to be increased by approximately $3,000 dollars a month. Reale assured Montoro that "there would be something in it for us." Hartman said that the TPBA Officers would personally receive $1,800 each month from LL & K and that Kramer would deliver the money. When Hartman left, Reale and Montoro agreed that the bribe would be split evenly among themselves and Zichettello. Montoro and Kramer subsequently arranged a monthly meeting so that Montoro could give Kramer the monthly retainer check in return for an envelope of cash containing $1,800. This arrangement continued until approximately March 1993.

### C. LL & K's Quarterly Bribes

Sometime in 1992, Reale sought and received bribes from partners at A & G. As part of that effort, Reale decided to award A & G the TPBA's CLDF-related "work." Reale set up a meeting with Hartman and Lysaght to notify them that LL & K was being replaced by A & G. Hartman and Reale met in private and agreed to raise LL & K's monthly retainer for labor relations work from approximately $17,400 to $20,000 and to have the TPBA pay LL & K an additional $200,000 annually, on a quarterly basis, for the law firm's handling of contract negotiations. In exchange, Kramer would deliver $18,000 in cash to the TPBA Officers each time the TPBA made a $50,000 quarterly payment. After Lysaght arrived, he reassured Montoro that they could prevent disclosure of the scheme. Thus, beginning in April 1993, the TPBA issued quarterly $50,000 checks to LL & K for its labor relations work, and Kramer delivered $18,000 in cash to Montoro in return. Montoro split the money with Reale and Zichettello. These quarterly payments continued at least until Montoro retired in 1994.

### 2) Bribes by Hartman Regarding the Life Insurance Scheme

In addition to acting as a labor negotiator, Hartman also brokered whole life insurance policies issued by the Metropolitan Life Insurance Company ("Metlife"), for which Hartman received a percentage of the premia paid. Before Reale took office in 1989, the TPBA offered only term life insurance to its members. In 1990 and 1991, however, Montoro discussed with insurers the possibility of making whole life insurance available to TPBA members as well. Hartman of course wanted to promote the sale by him of Metlife policies to TPBA members. Hartman and Reale assured Montoro and Zichettello that there would be something in it for them if they agreed to permit Hartman to offer the Metlife policies to TPBA members. In an agreement dated August 2, 1991, the TPBA recognized Hartman as "the agent and broker of record selected by the TPBA" for whole life insurance.

According to Montoro, the TPBA Officers received two bribes from Hartman in connection with this scheme: a $100,000 payment in the fall of 1992 and approximately $17,000 in the spring of 1993. However, Zichettello testified that the TPBA Officers received only one bribe related to the sale of the insurance policies: approximately $6,000 in the spring of 1993. Because of this discrepancy, the government voluntarily withdrew from the jury consideration of the Racketeering Act based upon the $100,000 bribe. Even though Montoro's and Zichettello's accounts as to the amount of the second bribe differed, their testimony as to the delivery of the payment of that second bribe was consistent. Both Zichettello and Montoro recalled that, when Hartman delivered the payment to the TPBA Officers, Hartman apologized for the modest size of the payment and then handed Montoro a white envelope filled with $100 bills. Both Zichettello and Montoro testified that they had expected a higher payoff.

### 3) Campaign Finance Scheme

In the spring of 1993, Reale launched a campaign to obtain the Democratic nomination for the newly-created position of Public Advocate of the City of New York. In connection with Reale's campaign, Reale applied to participate in a program administered by the NYCCFB that provided matching funds to candidates for City public offices. To be eligible for the program, a candidate is required, among other things, to raise a threshold of $125,000 in campaign contributions from individuals residing in New York City and to submit periodic disclosures to NYCCFB concerning information about contributions. In exchange, the NYCCFB, using public tax revenues, matches any contribution to a candidate's campaign up to $1,000.

### A. Sham Contributions

After Reale signed the application to participate in the program, he gave his girlfriend, Marguerite Golino, $3,000 in cash and asked her to obtain three $1,000 contributions from New York City residents. Golino made out one contribution check in her own name and obtained contributions from her mother and her brother's girlfriend. These sham contributions were listed by the Reale Campaign in disclosure statements filed with the NYCCFB and were subsequently matched.

Reale also submitted other sham contributions. For example, in July 1993 he received a $10,000 cash donation. A campaign worker was then sent out to purchase ten $1,000 money orders from various banks. About the same time, another campaign worker and Reale's secretary, Linda Oliva, observed numerous blank $1,000 money orders on a table and overheard discussions about the names that were going to be placed on those orders. Reale was in the room and participated in the conversations. Moreover, his handwriting appeared on at least one of the money orders. When questioned about sham orders by Oliva, Reale responded that it was merely a "bending" of the rules.

For another example, Golino's brother, Angelo, submitted a false invoice from one of his companies to the TPBA, which the TPBA paid by issuing a check. Golino used the proceeds of that check to purchase nine money orders for $1,000 each. Golino and Angelo then got five New York City residents to allow their names to be placed on the money orders. The remaining money orders were sent in blank to Montoro, who gave them to Reale. Three of these four money orders were submitted to the campaign in the name of Reale's relatives. At least two of the money orders, or the documentation submitted with them, bore Reale's handwriting.

### B. Hartman Obtains Sham Contributions

Hartman also played a role in misappropriating TPBA funds to pay for the Reale Campaign. Reale told Oliva that Hartman was going to provide contacts for donations and that Hartman thereafter produced some contributions. Actually, Hartman told Montoro to issue a $25,000 check to LL & K that Hartman would convert into campaign contributions from another police organization with which he was affiliated. Montoro did as told and issued a $25,000 check from the TPBA's insurance fund. A few weeks earlier, Montoro had issued a check to LL & K for $35,000. The circumstantial evidence offered by the government strongly supported its theory that Hartman used these funds—the $25,000 and $35,000 checks—to generate sham contributions to the Reale Campaign.

After the 1993 election, a federal investigation of the Reale Campaign's funding began. As a result, Reale had his wife prepare a list of all campaign contributions. Montoro showed Hartman the list. In reviewing it, Hartman commented that certain contributions on the list were "mine."

## C. Reale's Campaign Debts

After losing the primary in the fall of 1993, Reale used TPBA funds to pay off campaign debts. He asked Golino to submit to the TPBA a false invoice for approximately $26,000 from Angelo's car dealership. The invoice was paid and the cash was then used to reimburse Reale's stepbrother for money he contributed to the campaign. Thereafter, Angelo wanted to be reimbursed for his campaign contributions. Because there was no money left in the campaign, Reale authorized Montoro to pay on false invoices submitted by Angelo to the TPBA.

## 4) Witness Tampering

After the federal investigation of the Reale Campaign began, Reale directly contacted numerous purported contributors. In one instance, Reale advised a close friend who was a police officer that the names of the officer and his wife had been used on money orders. Reale asked the officer to lie to federal investigators when questioned about whether the officer had in fact purchased the money order on his own. Thereafter, the officer did initially lie to government agents.

## c) *Conviction and Sentencing*

On January 22, 1998, the district court charged the jury. After deliberating for approximately four days, the jury convicted the appellants on every count and every applicable RICO predicate act set forth in the indictment and in the jury's special verdict sheet. The district court principally sentenced Reale to 84 months' imprisonment, Hartman to 60 months, and Lysaght and Kramer each to 27 months. Richardone was sentenced to 33 months' imprisonment and ordered to pay $38,200 in restitution. All appellants are serving their sentences.

## DISCUSSION

### a) *The Government's Motion to Amend the Transcript*

We turn first to the unusual issue briefly described in the introduction to this opinion—a very serious and troubling dispute over the content of the jury instructions given by the district court.

### 1) The Issue

Point I of the main brief filed by Hartman, Lysaght, and Kramer was titled "Reversal is Required Because the District Court Amended A Penal Statute and the Indictment." (Reale's brief adopted this argument by reference.) The argument in Point I was based on the transcript of jury instructions received by the parties from the trial court reporter many weeks after the trial concluded in late January 1998. We quote from the pertinent argument verbatim with footnotes:

> [T]he principal predicate offense allegation for the RICO conspiracy charges against these defendants is that they bribed, or aided and abetted in the bribery, of a labor official in violation of New York law, a crime which could only become a federal offense by virtue of RICO's definition of certain state offenses, including bribery, as RICO predicates if they are "chargeable under State law and [are] punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). Obviously, outside of the RICO counts in the Indictment, the prosecution did not, and could not, have prosecuted these defendants in federal court for violating New York law.

> When the court instructed the jury as to the New York bribery charges, however, it amended the Indictment by characterizing these predicate offenses as including a conspiracy to violate New York Penal Law 180.15. (App.0616–19). In particular, the court instructed the jury that "In connection with the racketeering acts," these defendants were also charged with:

> [A]iding and abetting the commission of those crimes. The aiding and abetting statute, Section 2(a) of Title 18 of the United States Code provides that:

Whoever *conspires to* commit an offense against the United States, or aids, abets, counsels, commands, induces or *procures its commission in the conspiracy to commit,* is punishable as a principal.[5]

fn5 As enacted by Congress, the relevant provision of section 2 provides:

Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

App. 0616 (emphasis added).

This instruction is an inaccurate rendition of the federal aiding and abetting statute, 18 U.S.C. § 2(a), and the underlined language concerning conspiracies cannot be found in the statute which Congress enacted. This language was not included in the court's draft charge. Draft Jury Charge, (App.0531–33). The addition of this language to the federal aiding and abetting statute effectively transformed it into a general conspiracy statute whereby conspiracy, or even aiding and abetting a conspiracy to violate N.Y. Penal Code § 180.15, became a predicate RICO offense. This was error.

The balance of the court's charge regarding these state predicate bribery offenses demonstrates that this was not simply a judicial transcription error, but rather an intentional effort to implement the new statute, as amended. The court immediately followed this charge language with repeated instructions to the jury that it could find these defendants guilty if the government only proves that these defendants aided and abetted a conspiracy to violate N.Y. Penal Code § 180.15. (App.0616–20) (Judge's charges).[6]

Fn6 "A person who aids, abets, counsels or induces another person to conspire or commit an offense is just as guilty of that offense as if he

had conspired or committed it himself."

Accordingly, you may find a particular defendant guilty if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, *or conspired to commit the crime,* and that the defendant aided, abetted, counseled or induced that person or persons in the commission of the offense.

. . . . .

As you can see, the first requirement is that another person has committed or conspired to commit the crime charged....

App. 0617 (emphasis added).

The redrafting of federal statutes, however, is not the proper province of the judiciary, and "[f]ederal crimes are defined by Congress, not the courts." *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 1226 n. 6, 137 L.Ed.2d 432 (1997) (citing cases).

Under New York law, both by statutory and common law, conspiracies are treated as lesser offenses than aiding and abetting violations. *People v. McGee,* 49 N.Y.2d 48, 424 N.Y.S.2d 157, 399 N.E.2d 1177 (1979), *cert. denied,* 446 U.S. 942, 100 S.Ct. 2166, 64 L.Ed.2d 797 (1980). A violation of N.Y. Penal Code § 180.15 is categorized as a class D felony, but a conspiracy to violate a class D felony is only a misdemeanor. N.Y. Penal Code § 105.05. More specifically, a conspiracy to violate N.Y. Penal Code § 180.15 is a conspiracy "in the fifth degree" which is a class A misdemeanor punishable by imprisonment which "shall not exceed one year" under N.Y. Penal Code § 70.15(1).[7]

fn7 The same result is reached if the allegation is one of aiding and abetting a conspiracy. Under New York law, an aider and abettor only faces the same potential punishment as a principal. N.Y. Penal Law

§ 20.00. If the principal offense is conspiracy, then one who aids and abets a section 180.15 conspiracy would likewise only commit a Class A misdemeanor.

Because a conspiracy to violate N.Y. Penal Code § 180.15 is not a state bribery offense "punishable for more than one year," within the meaning of RICO's definition of permissible state predicate offenses, 18 U.S.C. § 1961(1), the jury was improperly instructed that it could convict these defendants based upon criminal conduct which is not a RICO predicate. The defect lies not in the indictment, which limited the predicate allegations to substantive or aiding and abetting New York bribery offenses, but in its expansion through the Court's charge to the jury, which told the jury that it could find defendants guilty based solely upon a finding that they conspired, or even only aided and abetted a conspiracy, to violate N.Y. Penal Law § 180.15, both of which are only class A misdemeanors, and therefore are not federal RICO predicates. The jury was further prompted to convict these defendants based upon a misdemeanor conspiracy to violate N.Y. Penal Law § 180.15 by the special verdict form (Special Verdict Form, at 9) (App.0671), which asked the jurors to check any of the listed predicate acts which they found defendants "agreed or conspired with others to commit."

Appellants' Br. At 10–12.

Obviously, this argument had colorable force because the challenged instructions did indeed misquote the federal aiding and abetting statute and in other ways compounded the misquotation by, for example, including language about aiding and abetting a conspiracy.[4]

The government's brief was filed on March 24, 1999. It did not dispute that

---

4. The pertinent portion of the charge received by the parties from the court reporter (styled *infra* as the "Official Revised Charge") reads as follows:

In connection with the racketeering acts I have just discussed, defendants Hartman, Lysaght and Kramer are also charged with aiding and abetting the commission of those crimes. The aiding and abetting statute, Section 2(a) of Title 18 of the United States Code, provides that:

"Whoever conspires to commit an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission in the conspiracy to commit, is punishable as a principal."

In other words, it is not necessary for the government to show that a defendant himself conspired to confer, offer or agree to confer a bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a defendant actually conspired to commit the crime of bribery, you may still find the defendant guilty of that crime as an aider or abettor.

A person who aids, abets, counsels or induces another person to conspire or commit an offense is just as guilty of that offense as if he had conspired or committed it himself.

Accordingly, you may find a particular defendant guilty if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, or conspired to commit the crime, and that the defendant aided, abetted, counseled, or induced that person or persons in the conspiracy to commit the offense.

You may also find the person guilty of the crime of conspiracy if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, and that the defendant aided, abetted, counseled or induced that person or persons in the commission of the offense.

As you can see, the first requirement is that another person has committed or conspired to commit the crime charged. Obviously, no one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place. But if you do find that a crime was committed, then you must consider whether the defendant you are considering aided and abetted, or commanded, the commission of the crime.

In order to aid or abet another in a conspiracy to commit a crime, it is necessary that a defendant willfully and knowingly associate himself in some way with the conspiracy, and that he willfully and knowingly seek by some act to help make the conspiracy succeed. Participation in a conspiracy is willful if action is taken voluntarily and intentionally; that is to say, with a bad purpose either to disobey or to disregard the law.

the challenged instructions had been given but rather argued that: (i) defense counsel had not objected to the instructions at trial and they were not plain error; (ii) under *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), a defendant can be convicted of a RICO conspiracy without proof that he or she committed a predicate racketeering act and the instructions were therefore harmless; and (iii) the instructions in question, when read in conjunction with other instructions, were substantially correct or harmless. The government faced an uphill battle on this issue because the instructions did include, *inter alia*, a *sua sponte* amendment of a federal statute. Moreover, the case went to the jury on a pre-*Salinas* legal theory that focused the jury's attention on the alleged predicate acts. It would therefore be difficult to unravel after the fact the erroneous instructions and determine them to be harmless. *See infra* note 13 and accompanying text.

On April 9, after the government's brief had been filed, the government moved to "correct the record so that it reflects the charge given to the jury and [to] strike Point One [—the argument concerning the indictment being amended by the district court's aiding and abetting charge—] of appellants' brief." Appellee's Mot. To Correct R. and To Strike. In its motion, the government asserted that when the prosecutors responsible for the trial reviewed Point I of the Hartman, Lysaght, and Kramer brief, "they did not recall that the District Court's aiding and abetting charge included the highlighted and challenged language, which was not in the Draft [Charge] .... and all of them believed that they would have noticed such a deviation from the Draft [Charge]." Pomerantz Affirm. ¶ 8. However, none of them could say with "absolute certainty" that the district court had not delivered the charge as reflected in the official transcript. *Id.* Accordingly, and because the government was under "significant time pressure to file a factually complex and lengthy brief," the government decided to submit a brief responding to appellants' Point I on the merits. *Id.*

Three days after the government's brief was filed, the person who had served as the trial judge's law clerk ("Law Clerk") during the trial—he had left in September 1998, after two years of service, *see* Law Clerk Affirm. ¶ 2—encountered a former Assistant United States Attorney ("AUSA") who had been one of the lead prosecutors in the case. *See id.* ¶ 11; Hirshman Aff. ¶ 2. The occasion was a social event at Fordham Law School. *See* Hirshman Aff. ¶ 2. The AUSA and her husband, a Fordham law professor ("Law Professor"), depicted the ensuing conversation as follows. The AUSA told the Law Clerk that she did not remember the district judge giving the instructions described in Point I of the appellants' brief. *See id.* The Law Clerk said that he also did not remember them. *See id.* The Law Professor recalled the Law Clerk also saying he had actually returned to the judge's chambers and found that the instructions in the "script" read to the jury by the judge were different from those in the transcript upon which the appellants' brief relied. *See* Pearce Aff. ¶ 3. The Law Clerk recalls the conversation with the AUSA and remembers telling her that he believed that the charge described by appellants was correct on the law. *See* Law Clerk Affirm. ¶ 11. He does not recall mentioning a script or saying that the language in question was not in the script. *See id.*

This conversation prompted the government to inquire further into the charge issue. Days later, the government communicated with the court reporter, Vincent Bologna, who had transcribed the jury instructions. *See* Pomerantz Affirm. ¶ 10. Bologna told the government that the language challenged by appellants was not, in his view, actually read to the jury. *See* Bologna ⁵⁹/₉₉ Aff. ¶¶ 2, 4, 6. Based on this and documents provided by Bologna, the government concluded that there was com-

pelling evidence that the record certified to this court was in error on an issue material to the appeal. *See* Pomerantz Affirm. ¶ 12.

The AUSA contacted the attorneys who represented appellants at trial and asked them whether they remembered hearing the challenged language during the jury charge. The attorneys all stated in substance that they did not remember whether the district court actually uttered the challenged words. *See id.* ¶ 13. The government thereafter contacted appellants' appellate counsel to seek their consent to amend the transcript and strike Point I of the Hartman, Lysaght, and Kramer brief. Understandably, appellate counsel did not consent to the request. *See id.* ¶ 14. Accordingly, the government filed the present motion to amend in this court. We thereafter invited the district judge to sub-

mit her version of events in writing. She responded with an affidavit and submitted as well an affidavit of the Law Clerk.

### 2) Evolution of the Charge

As would likely be the case in any complex trial, various versions of proposed jury instructions exist. In the present case, several such versions of the pertinent instructions are relevant, and we now turn to describing them.

The first relevant version is an eighty-five page draft ("Draft Charge") given by the court to the parties and discussed at a charge conference on January 12, 1998. The Draft Charge contained a standard charge on aiding and abetting taken almost verbatim from Sand's *Modern Federal Jury Instructions*.[5] *See* 1 L. Sand et

---

5. That portion of the Draft Charge read as follows:

In connection with the Racketeering Acts I have just discussed, Defendants HARTMAN, LYSAGHT, and KRAMER are also charged with aiding and abetting the commission of those crimes. The aiding and abetting statute, section 2(a) of Title 18 of the United States Code, provides that:

"Whoever commits an offense against the United States or aids, abets, counsels commands, induces or procures its commission, is punishable as a principal."

In other words, it is not necessary for the Government to show that a Defendant himself conferred, offered or agreed to confer a bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a Defendant actually committed the crime of bribery, you may still find the Defendant guilty of that crime as an aider or abettor.

A person who aids, abets, counsels or induces another person to commit an offense is just as guilty of that offense as if he committed it himself. Accordingly, you may find a particular Defendant guilty of the substantive crime if you find, beyond a reasonable doubt, that the Government has proved that another person or persons actually committed the crime, and that the Defendant aided, abetted, counseled or induced that person or persons in the commission of the offense.

As you can see, the first requirement is that another person has committed the crime charged. Obviously, no one can be convicted of aiding and abetting the criminal acts of

another if no crime was committed by the other person in the first place. But if you do find that a crime was committed, then you must consider whether the Defendant you are considering aided and abetted, or commanded, the commission of the crime.

In order to aid or abet another to commit a crime, it is necessary that a Defendant wilfully and knowingly associate himself in some way with the crime, and that he wilfully and knowingly seek by some act to help make the crime succeed. Participation in a crime is wilful if action is taken voluntarily and intentionally; that is to say, with a bad purpose either to disobey or to disregard the law.

The mere presence of a Defendant where a crime is being committed, even coupled with knowledge by the Defendant that a crime is being committed, or the mere acquiescence by a Defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

To determine whether a Defendant aided and abetted, or commanded, the commission of a crime with which he is charged, ask yourself these questions:

— Did he participate in the crime charged as something he wished to bring about?

— Did he associate himself with the criminal venture knowingly and wilfully?

— Did he seek by his actions to make the criminal venture succeed?

If he did, then that Defendant is an aider and abettor and therefore guilty of the offense. If he did not, than that Defendant is not

al., Modern Federal Jury Instructions ¶ 11.01, Instr. 11–1 & 11–2. No party objected to it. It of course contained none of the language that is the subject of contention in Point I of the Hartman, Lysaght, and Kramer brief.

On January 22, 1998, ten days after the charge conference and the day on which the charge was given, the district court gave a revised version of the Draft Charge to Bologna. We will style this version the "Final Draft Charge." No copy of this draft was given to the parties. The Final Draft Charge followed the text of the Draft Charge with approximately fifty handwritten changes. The Final Draft Charge did not, however, contain any of the language now claimed as error by appellants. Indeed, the aiding and abetting portion of the Final Draft Charge and the Draft Charge were identical. That portion of the charge was read to the jury just before a late-afternoon lunch break.

While the jury instructions were being given, Bologna prepared stenographic notes "based upon what [he] heard the judge say." Bologna ⅌₉₉ Aff. ¶ 2. As he did so, the notes were recorded by a stenograph machine onto a paper tape and a computer diskette. We will style the hard copy of this the "Court Reporter's Charge." At the same time, his· notes were converted into readable text and immediately transmitted on the district court's and the parties' laptop computers by the "real-time" process. This version cannot be printed and is available only on the court reporter's computer. However, its contents are not in dispute. We will style this version the "Real Time Charge." Neither the Court Reporter's Charge nor the Real Time Charge contain the disputed language except for a single reference to the word "conspiracy" in a paragraph that

is in the Court Reporter's Charge and Real Time Charge but in neither the Draft Charge nor the Final Draft Charge.[6] No lawyer—for the prosecution or defense—objected to any part of the disputed portion of the charge when it was read to the jury on January 22, 1998.

The dispute over the instructions arose from the version of the charge kept in the district judge's chambers. According to her affidavit, it is her regular practice to read the jury charge verbatim from "a finalized document." District Ct. Affirm. ¶ 3. Generally, "the charging conference takes place within a day or two of the delivery of the charge to the jury, and any subsequent changes made are handwritten by me in colored pen, so that I may easily see and incorporate them as" they are read to the jury. *Id.* Occasionally, the district judge "may make changes in the charge while reading to the jury, and pause to write these changes on the copy from which I read . . . . so that my law clerk has what is actually read . . ., including all last minute revisions, in order to correct the draft charge accurately when received from the court reporters." *Id.*

It is also the district judge's regular practice to have her law clerks "take the version of the jury charge that the Judge read to the jury from the Bench and place it in a looseleaf binder in Chambers where the charges from other trials were put after a jury reached its verdict." Law Clerk Affirm. ¶ 8. In this case, the Law Clerk affirms that· he recalls "taking the version of the jury charge that Judge Batts read to the jury and placing it in the binder in Chambers." *Id.* The version in the binder is predictably styled the "Binder Charge." The Binder Charge contained numerous, substantive handwritten changes to the aiding and abetting portion

an aider and abettor, and is not guilty of that offense.

**6.** That paragraph reads:
> You may also find the person guilty of the crime of conspiracy if you find, beyond a reasonable doubt, that the government has

proved that another person or persons actually committed the crime, and that the defendant aided, abetted, counseled or induced that person or persons in the commission of the offense.

of the jury charge that the district judge says were written by her. *See* Neiman Aff. Ex. C; District Ct.. Affirm. ¶ 9. These include changes to the very language of the aiding and abetting statute itself.[7] A photocopy of the pertinent portion of the Binder Charge is attached to this opinion as Appendix A. The Binder Charge also had a handwritten post-it note placed on page 1 by the Law Clerk that stated, "[t]hese corrections [*i.e.*, the district court's handwritten changes] need to be entered into [the] computer file." Law Clerk Affirm. Ex. 2.

The Southern District of New York follows a practice that is unusual and perhaps unique. *See* Pomerantz Affirm. ¶ 11; Bologna ⅘₉ Aff. ¶ 3; Leiwant Decl. After jury instructions are given in a case, the court reporter submits a transcript of the instructions to the district judge for review. See Pomerantz Affirm. ¶ 11; Bolo-

gna ⅘₉ Aff. ¶ 3. The court reporter does not release a transcript to the parties until after the judge reviews, and in some cases corrects, it. *See* Pomerantz Affirm. ¶ 11; Bologna ⅘₉ Aff. ¶ 3. Presumably, the purpose of this practice is to allow a judge to correct minor stenographic errors or typos. Because the parties receive only a printed transcript that incorporates the judge's revisions, the parties are not informed of such revisions.

Following this practice, Bologna printed his stenographic notes of the jury instructions and hand-delivered that version—the Court Reporter's Charge—to the district judge's chambers on January 23, 1998, one day after the charge was given. *See* Bologna ⅘₉ Aff. ¶ 3. On or about March 9, 1998, more than six weeks later, the district court returned the Court Reporter's Charge to Bologna with numerous handwritten changes. *See id.* The majority of

---

7. The substantive changes to the aiding and abetting portion of the Binder Charge appear below. The underlined words were added by handwriting and the words with lines through them were struck out. The brackets around certain words were among the handwritten changes.

> In connection with the Racketeering Acts I have just discussed, Defendants HARTMAN, LYSAGHT, and KRAMER are also charged with aiding and abetting the *conspiracy to commit* [commission of] those crimes. The aiding and abetting statute, section 2(a) of Title 18 of the United States Code, provides that: "Whoever *conspires to* commits an offense against the United States or aids, abets, counsels, commands, induces or procures [its commission,] *in the conspiracy to commit* is punishable as a principal."
> In other words, it is not necessary for the Government to show that a Defendant himself *conspired to* conferred, offered or agreed to confer a bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a Defendant actually *conspired to commit* [committed] the crime of bribery, you may still find the Defendant guilty of that crime as an aider or abettor.
> A person who aids, abets, counsels or induces another person to *conspire or* commit an offense is just as guilty of that offense as if he *had conspired or committed* committed it himself.

> Accordingly, you may find a particular Defendant guilty of the substantive crime if you find, beyond a reasonable doubt, that the Government has proved that another person or persons actually committed the crime, *or conspired to commit the crime* and that the Defendant aided, abetted, counseled or induced that person or persons in the *conspiracy to commit* commission of the offense.
> As you can see, the first requirement is that another person has committed *or conspired to commit* the crime charged. Obviously, no one can be convicted of aiding and abetting the *conspiracy to commit of others if there was no conspiracy to commit the crime* criminal acts of another if no crime was committed by the other person in the first place. But if you do find that a *conspiracy to commit a crime existed* crime was committed, then you must consider whether the Defendant you are considering aided and abetted, *that conspiracy* or commanded, the commission of the crime.
> In order to aid or abet another *in a conspiracy* to commit a crime, it is necessary that a Defendant wilfully and knowingly associate himself in some way with the *conspiracy* crime, and that he wilfully and knowingly seek by some act to help make the *conspiracy* crime succeed. Participation in a *conspiracy* crime is wilful if action is taken voluntarily and intentionally; that is to say, with a bad purpose either to disobey or to disregard the law.

changes were stylistic or corrected spacing, typographical errors, and acronyms. *See* Neiman Aff. Ex. E. There were also, however, extensive handwritten revisions to the aiding and abetting portion of the charge. *See id.* at 6155–56. We will style the transcript returned to the reporter with the handwritten revisions the "Revised Charge." A photocopy of the pertinent portion appears in Appendix B. But for an insertion reading "see pg. 70," the Court Reporter's Office incorporated the handwritten changes into the transcript and released a hard copy of this version to the parties. *See* Bologna Aff. ¶ 5. *Compare* Neiman Aff. Ex. E at 6154–56 *with id.* Ex. G at 6154–56. We will style this final version the "Official Revised Charge."

Although we analyze the affidavits of the district judge and the Law Clerk in detail *infra*, we briefly summarize them here. The district judge has no independent recollection of reading any particular version of the aiding and abetting charge to the jury. *See* District Ct. Affirm. ¶ 2. However, she states that it is her "regular practice" to read jury charges verbatim from a finalized document that may include last minute handwritten revisions that may not have been given either to counsel or the court reporter. *See id.* ¶¶ 3–4. The finalized document with notations is used by law clerks to compare with, and correct, transcripts received from court reporters. *See id.* ¶ 4. Her laptop computer notes also indicate a discussion with the Law Clerk during a lunch break immediately *after* the disputed portion of the charge regarding aiding and abetting had been delivered.[8] In this discussion, she expressed doubt

over the correctness of that portion of the charge. *See* District Ct. Affirm. Ex. C. That doubt concerned the fact that the charge "deal[t] with substantive crimes and not conspiracy." *Id.* These laptop notes are Appendix C to this opinion.

The Law Clerk's affidavit states that, because he never deviated from the practice of placing the charge given by the judge in the proper looseleaf binder and because he remembers doing so in the present case, he is certain that the Binder Charge was the one read to the jury. *See* Law Clerk Affirm. ¶ 8. Moreover, he "vividly recall[s] Judge Batts using the conspiracy language when she charged the jury on aiding and abetting" because of his lunch-break discussion with her regarding this portion of the charge. According to him, she asked him to draft by hand another version of the aiding and abetting charge "without some of the conspiracy language." *Id.* ¶ 7. He states that he did so and has provided us with a copy of that revision. A photocopy of his handwritten proposed revision is Appendix D to this opinion.

As the clerk responsible for "editing" the Court Reporter's Charge, the Law Clerk compared it to the, in his words, "original charge"—the Binder Charge. *Id.* ¶ 9. However, he states that he did not edit the Court Reporter's Charge "fully and accurately," *id.*, and, as a result, there are significant differences between the Binder Charge and the Official Revised Charge, differences discussed in detail *infra*.

---

8. From the district judge's laptop notes, it is not clear whether the discussion with the Law Clerk occurred during the 3:00 lunch break or during some subsequent recess. *See* District Ct. Affirm. Ex. C. The Law Clerk affirmed that the discussion occurred in the robing room "some time after Judge Batts read [the aiding and abetting] portion of the charge to the jury [when] the Court took a break." Law Clerk Affirm. ¶ 7. Most likely, this conversation occurred during the lunch break, some ten to fifteen minutes after the aiding and abetting portion of the charge was

read to the jury. *See* Moy Affirm. ¶¶ 24–25 & n.11; Neiman Aff. Ex. E at 6154–56, 6163. Time data from the Real Time Charge indicate that the court took only a two and one-half minute break and a one minute pause between the time that the court resumed giving the charge after lunch and the time that the jury retired to deliberate. *See* Moy Affirm. ¶ 25. Regardless of when the conversation occurred, however, it is absolutely clear that it took place at some point *after* the aiding and abetting portion of the charge was read to the jury.

### 3) Applicable Legal Standards

 The government's motion to amend is governed by Fed. R.App. P. 10(e), which reads:

(e) Correction or Modification of the Record (1) If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.

(2) If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:

(A) on stipulation of the parties;

(B) by the district court before or after the record has been forwarded; or

(C) by the court of appeals.

(3) All other questions as to the form and content of the record must be presented to the court of appeals.

Tension arguably exists between Rule 10(e)(1) and (e)(2) as to whether parties must initially seek relief from the district court or whether they have the option to proceed in the court of appeals. In our view, parties should generally seek relief initially from the district court. Nevertheless, the rule plainly states that either court has the power to resolve a dispute over the record in the first instance. *See generally* 20 James Wm. Moore et al., Moore's Federal Practice § 310.40[1], at 310–33 (3d ed.1999). Considering the unique circumstances in this case—chambers revisions to transcribed jury instructions without notice to the parties—it would not be appropriate to require the government now to seek relief from the district court. Moreover, the district court and the Law Clerk provided their version of events.

 Having concluded that we have the power to decide the motion and that it is appropriate for us to exercise it, we next address the legal standard to be applied in circumstances in which the district judge has affirmed that she has "no reason to believe that the charge actually given to the jury on January 22, 1998, was anything other than what is reflected" in the Official Revised Charge. District Ct. Affirm. ¶ 2. We of course give great deference to the district court's view and "must accept the [district] court's reconstruction of the record under Federal Rule of Appellate Procedure 10[e] unless it was intentionally falsified or plainly unreasonable." *United States v. Keskey,* 863 F.2d 474, 478 (7th Cir.1988); *see also United States v. Mori,* 444 F.2d 240, 246 (5th Cir.1971) (trial court's "determination, absent a showing of intentional misrepresentation or plain unreasonableness, is conclusive").

### 4) Application of the Legal Standard

There is no evidence whatever that the district court intentionally falsified the record, and nothing in our opinion should be read to suggest otherwise. However, both the district court's belief and the Law Clerk's recollection that the Official Revised Charge was actually read to the jury are plainly unreasonable. All the known facts, including most importantly the contemporaneous writings of the district judge and the Law Clerk, firmly and fully support the government's contention that the district court did not give the instruction contained in the Official Revised Charge.

The district court's belief that the Binder Charge was actually given is based solely on the chambers' practice of the law clerk placing the copy of the instructions read by the judge in the proper looseleaf binder. She does not claim to remember what she actually said, a lack of recollection that is entirely understandable because more than fourteen months passed between the giving of the charge and the government's motion. However, her contemporaneously typed notes on her laptop computer cannot be squared with the speculation that the Binder Charge was read to the jury. Those notes state that the lunch

break on January 22, 1998 took place at 3:00 p.m., *after* the disputed aiding and abetting instructions had been given. *See* Appendix C; *see also* Neiman Aff. Ex. E at 6154–56, 6163 (lunch recess taken shortly after aiding and abetting charge given); Moy Affirm. ¶¶ 24–25 & n.11 (same). The notes go on to state that the judge then had a discussion with the Law Clerk over whether the aiding and abetting charge just given was "right [sic] since it deals with substantive crimes and not conspiracy." *Id. But see supra* note 8 and accompanying text (discussion not necessarily at lunch break but clearly after aiding and abetting charge was given). However, it is precisely the charge as originally transcribed by the reporter that "deals with substantive crimes and not conspiracy," and the Official Revised Charge—incorporating the Binder Charge—that introduces the language regarding conspiracy. Moreover, the notes make clear that the district court had given the charge as proposed by the government, *see id.*, which did not include the language regarding conspiracy.

We turn then to the Law Clerk's recollection of events, namely that he edited the Court Reporter's Charge based on his practice of taking from the bench the instructions from which the judge read, inserting them in a looseleaf binder, and comparing the transcript supplied by the court reporter with what was found in the proper binder. *See* Law Clerk Affirm. ¶¶ 8–9. He also "vividly recall[s]" the Binder Charge being given because of the district court's concern expressed at the lunch break regarding the just-given aiding and abetting charge, a concern causing her to ask him to draft revisions to the charge that eliminated the conspiracy language. *See id.* ¶ 7. Problems abound in the Law Clerk's version of events.

First, the handwritten changes in the Revised Charge seem not to be in the Law Clerk's handwriting. *Compare* Appendix B *with* Appendix D. Of course, if the handwritten changes are not in his handwriting, then both his and the judge's reliance on the usual chambers' practices being followed in this case is misplaced.

Second, the Law Clerk's version of the lunch-break discussion is entirely at odds with the judge's contemporaneous notes. As discussed above, the district judge's notes indicate that her concern over the instructions just given had been the *lack* rather than *presence* (as the Law Clerk recalls) of the conspiracy language. Because her notes were written at the time and he is recalling events that took place over a year before, the notes would ordinarily be deemed more reliable than his conflicting affidavit. However, additional examination of the Law Clerk's submission resolves all doubt. A reading of the Law Clerk's handwritten proposed revisions—drafted at the judge's request—clearly demonstrates that they were intended to *add*, not eliminate, the conspiracy language. The Binder Charge and the Law Clerk's handwritten proposed revision are remarkably similar in relevant text. *Compare* Appendix A *with* Appendix D. Critically, in only one place is there conspiracy language in the Binder Charge that is absent from the Law Clerk's draft, *i.e.*, in his draft's (correct) quoting of 18 U.S.C. § 2(a). The remainder of the Law Clerk's draft basically mirrors the Binder Charge, including virtually all of the district court's handwritten changes. Indeed, in two places the Law Clerk's proposed revision omits language referring to the commission of the substantive offense that is in the Binder Charge, leaving only conspiracy language, a result that flatly contradicts the Law Clerk's recollection that he eliminated such language.[9] Thus, the contem-

---

9. *Compare* Binder Charge, Appendix A ("[Y]ou may find a particular Defendant guilty if you find, beyond a reasonable doubt, ... that another person or persons actually committed the crime, or conspired to commit the crime, and that the Defendant aided, [or] abetted, ... the conspiracy.... [T]he first requirement is that another person has committed or conspired to commit the crime charged.... [N]o one can be convicted of

poraneous notes of both the district court and the Law Clerk are powerful support for the government's position.

Third, the pertinent portions of the Binder Charge and the Revised Charge containing the handwritten revisions are similar but by no means identical, as would have been the case if the chambers' practices described above had been followed. The Revised Charge contains the paragraph mentioned earlier that appears for the first time in the Court Reporter's Charge. *See supra* note 6 and accompanying text. The Binder Charge does not. *See* Appendix A. The Law Clerk states that he should have deleted that paragraph because it was not in the Binder Charge and, therefore, in his view not delivered by the judge. *See* Law Clerk Affirm. ¶ 9. Also, the Binder Charge brackets words three times, while the Revised Charge includes the bracketed words on two occasions but deletes a bracketed word on the third. *Compare* Appendix A *with* Appendix B. A revision in the very first sentence of the Binder Charge is not in the Revised Charge, *compare* Appendix A *with* Appendix B, an omission for which no explanation is offered.

Also, in the next-to-last paragraph, the Revised Charge omits twenty words inserted by hand in the Binder Charge. *Compare* Appendix A *with* Appendix B. Near but not exactly where some of the insertions would go, the Revised Charge contains a handwritten notation with an insertion mark stating "see pg 70." *See* Appendix B. The Law Clerk's affidavit explains that the notation refers to the second page of the Binder Charge—marked page 70—and "was to remind me to insert the language in the [Revised Charge] that appears on the [relevant page of the Binder Charge]." Law Clerk Affirm. ¶ 10. If the Law Clerk wrote the notation, as his affidavit implies, this explanation makes little sense because he inserted language from the Binder Charge in the preceding paragraph, in the next-to-last paragraph itself, and in the final paragraph. He offers no reason why he would make all those revisions while omitting similar additional revisions in the next-to-last paragraph but with a reminder to himself to make them later.

Finally, all the other evidence in the record also powerfully supports the conclusion that the Binder Charge was not read to the jury. First, the alternative hypothesis posits that Bologna, over the course of two pages of transcript, failed to hear and record 60 words, erroneously recorded 37 other words, and hallucinated or fabricated an entire paragraph of text, which appears in no other version. *Compare* Appendix A *with* Appendix B. Bologna swears that the Court Reporter's Charge is based on his stenographic notes and that he transcribed, as he always does, the words that he heard spoken by the district court. *See* Bologna ⁴⁄₉₉ Aff. ¶ 2. No sustainable explanation has been given as to how a court reporter could have made so many mistakes, much less make virtually the same mistake—omitting the conspiracy language—many times over, while also inserting a paragraph apparently drawn from thin air.

Certainly, the evidence does not support a conclusion that Bologna simply copied the Final Draft Charge as given to him by the district court. Indeed, it is the judge's practice to advise reporters not to rely on the draft given them because she frequently alters it before reading it to the jury. *See* District Ct. Affirm. ¶ 6. Moreover, an

---

aiding and abetting the conspiracy to commit of others if there was no conspiracy to commit the crime by the other person in the first place.") *with* Law Clerk's Handwritten Proposed Revision, Appendix D ("[Y]ou may [find] a particular Defendant guilty if you find, beyond a reasonable doubt, . . . that another person or person[s] conspired to commit the crime and that the Defendant aided, [or] abetted, · . . . the conspiracy. . . . [T]he first requirement is that another person has conspired to commit the crime charged. . . . [N]o one can be convicted of aiding and abetting the commission of a conspiracy if there was no conspiracy to commit the crime by the other person or persons in the first place.").

examination of the Court Reporter's Charge in this matter in fact shows that it was in many critical respects *not* a verbatim copy of the Final Draft Charge. For example, the Court Reporter's Charge includes spontaneous comments that the district court injected in the course of reading the charge, *e.g.,* "which I will tell you later," *see* Neiman Aff. Ex. E at 6121 1.9; "Bear with me one minute, ladies and gentlemen," *see id.* at 6111 1.24; and "which was the substantive count we just discussed in Count One," *see id.* at 6137 ll. 2–3. Nor was Bologna listening only for such spontaneous injections and assuming that the substantive portions of the draft were unchanged. The Court Reporter's Charge also contains minor deviations from the Final Draft Charge that have to have reflected what was said rather than written, *e.g.,* "pleaded" rather than "pled," *compare id.* Ex. B at 30 *with id.* Ex. E at 6102 1.5, "a defendant" rather than "the defendant," *compare id.* Ex. B at 24 *with id.* Ex. E at 6096 1.21, "exhibits are charts" rather than "exhibits were charts," *compare id.* Ex. B at 9 *with id.* Ex. E at 6083 1.7, and, "conspiracy charge" rather than "conspiracy count," *compare id.* Ex. B at 73 *with id.* Ex. E at 6160 1.8. The Real Time Charge further demonstrates that Bologna transcribed what he heard rather than what he read. For example, the Final Draft Charge uses "$18,000" whereas the Real Time Charge uses "18,-000$," as it would have been spoken. *See* Moy Affirm. ¶ 20. Finally, the unexplained paragraph transcribed by Bologna is neither in the Final Draft Charge nor in the Binder Charge, although it is right in the middle of the disputed portion of the transcript. Thus, we can conclude only that Bologna transcribed the charge as actually given.

Moreover, there were at least nine lawyers—three prosecutors and six defense attorneys—present when the charge was read, but none objected to it. Each had the Draft Charge used at the charge conference. In addition, each had before him or her the Real Time Charge, the court reporter's version of what was then being said. None gave any hint that the court made the unannounced and undiscussed changes at issue notwithstanding the self-evident importance, and error, of those changes, including a patent misquoting of the aiding and abetting statute, language familiar to all lawyers who practice criminal law. Nor did any attorney note that, as was contemporaneously reflected on the Real Time Charge, the reporter was omitting material portions of the court's instructions while fabricating other portions. None of this resulted from counsels' inattentiveness. *See* Neiman Aff. ¶ 27. After the charge, one of the defense attorneys objected to the court's use of the phrase "despite the arguments of defense counsel," and another counsel objected to the court's modification of a sentence from the Draft Charge. *See id.* ¶ 26. We believe that it is highly likely that at least one of these attorneys would have objected to the challenged language if indeed it had been uttered.

We simply cannot conclude that the Law Clerk's recollection is even remotely sufficient to counter the evidence to the contrary, including the contemporaneous writings of the judge and the Law Clerk themselves. Indeed, the hypothesis that the Binder Charge—actually a charge somewhat similar to the Binder Charge—was read to the jury suffers from a lack of any plausible explanation, while the hypothesis that Bologna correctly transcribed what was said suffers from no such deficiency. Drafts of various kinds with handwritten notations, deletions, and insertions abound in chambers and may be carried around and mixed up with other papers. The explanation in the present matter could no doubt be as simple as the district court's tinkering at the lunch break with revisions to the already-given aiding and abetting charge and then carrying those pages onto the bench in anticipation of objections by counsel. That revised version could have been mistakenly

placed in the looseleaf binder, becoming the Binder Charge.

Indeed, the Binder Charge bears all the characteristics of a preliminary draft of possible revisions rather than a final draft with handwritten insertions. No district judge would purport to quote a statute to a jury that had the blatant handwritten alterations to statutory language found in the Binder Charge. A judge searching for language to be used in a later paraphrase, however, might well insert such language in a quoted statute. Moreover, portions of the Binder Charge make little sense. "[P]rocures its commission in the conspiracy to commit" is at best unfinished business. The Binder Charge is also clearly unedited. One sentence includes "committed committed." *See* Appendix A. And, while some words are crossed out, others are in brackets without any indication as to whether they are to remain in the text. *See id.*

■ On this record, therefore, it is plainly unreasonable to conclude that the challenged language was given to the jury. Indeed, it is clear that it was not. Thus, the record should be corrected to "conform to the truth" of the charge that was actually delivered. *United States v. Carter*, 347 F.2d 220, 221 (2d Cir.1965) (per curiam) (record may be corrected on basis of stenographic notes and other contempora-

neous documentation demonstrating that transcript was in error).

We therefore grant the government's motion to correct the transcript.[10] We see no need to strike Point I of the Hartman, Lysaght, and Kramer brief, however, rather than rejecting the argument as meritless.

### 5) SDNY Practice

■ The problem in the instant case has led lawyers on both sides to highlight a problematic practice in the Southern District of New York and has prompted one of them to ask this court to order that the practice be eliminated. *See* Leiwant Decl. at 2. According to lawyers for both the government and defense, as well as Bologna, the "standard practice" in the Southern District is for a court reporter to submit the transcript of jury instructions to the district court before releasing it to the parties. *See id.;* Pomerantz Affirm. ¶ 11; Bologna ⅚⁹ Aff. ¶ 3. The district court is free to alter the transcript, and any changes are incorporated in the "official" transcript without disclosing such changes to the parties. *See* Bologna ⅚⁹ Aff. ¶ 3. According to counsel, the Southern District is somewhat unique in this practice. *See* Leiwant Decl. at 2.

■ Courts do not have power to alter transcripts *in camera* and to conceal the alterations from the parties.[11] Given

10. Our disposition of the government's motion leaves the paragraph quoted in footnote 6 part of the official record. *See infra* note 15. Appellants' briefs have not claimed error in it, and we believe that the extensive instructions by the court correctly defining the crime of conspiracy render such error, if any, harmless.

11. For several reasons, we do not agree with our dissenting colleague that the government waived its right to move to correct and/or to modify the transcript on appeal. First, Fed. R.App. P. 10(e) does not contain a time limitation regarding such a motion. Second, such a motion would have to do far more than state that a transcript does not comport with the recollection of counsel for the movant; it would have to state affirmatively how a cor-

rect transcript would read. In this case, the district judge did not provide counsel with a copy of the draft instructions that she was going to read. The Final Draft Charge was provided only to the court reporter and even that did not correspond exactly to any of the various versions of the disputed charge. Because of the district court's actions, the government did not, therefore, have a correct document that might be compared with the transcript produced. Third, waiver involves the knowing abandonment of a right. Because the district court did not notify the parties that it had made substantial alterations to the transcript produced by the court reporter after trial—the Court Reporter's Charge—the government had little reason and no grounds to challenge the Official Revised Charge as not being the court reporter's ver-

the issues that arose in this case as a direct result of this practice, there appears to be little justification for continuing the practice in its present form. To be sure, a procedure that corrects obvious mistakes in transmission is useful, and the parties have little interest in closely monitoring such a procedure so long as the alterations are cosmetic. Monitoring by the parties, however, provides some assurance that only cosmetic changes will be made or, if not, that changes will correctly reflect what transpired in the particular proceeding. Moreover, there is little cost in informing the parties of cosmetic changes or at least of directing court reporters to give parties access to the original transcript when they request it.

Nevertheless, whether we have the power to order a change in such a practice is unclear.[12] We review judgments, and our review of the convictions and sentences here may not be an appropriate vehicle for the fine tuning of this practice. However, we invite the judges of the Southern District to consider revision.

b) *Appellants' Remaining Claims*

We turn now to appellants' other challenges to their convictions and sentences. Hartman, Lysaght, and Kramer claim that: (i) their conspiracy convictions should be reversed on a number of grounds; (ii) their convictions on all counts should be reversed for prosecutorial misconduct; (iii) the district court abused its discretion in admitting certain evidence; (iv) the district court abused its discretion in disqualifying trial counsel for Lysaght; (v) the evidence was legally insufficient to support the jury's verdict that Lysaght was involved in the predicate acts and to convict Hartman of wire fraud; (vi) the district court erred in failing to excuse a certain juror; and (vii) Hartman's sentence was based on error.

Reale joins in the above arguments where applicable and makes three specific arguments of his own: (i) the district court erred in failing to remove a certain juror (the same juror that Hartman, Lysaght, and Kramer challenge); (ii) the district court erred in handling issues concerning prejudicial publicity; and (iii) his sentence should be altered.

Richardone appeals only from his sentence. He claims that the district court erred in giving him a two-level role enhancement and refusing to give him a three-level reduction for acceptance of responsibility.

We discuss the various arguments and issues in turn.

## 1) RICO Conspiracy Convictions

Hartman, Lysaght, and Kramer attack their RICO conspiracy convictions for violating 18 U.S.C. § 1962(d) on several grounds.

### A. Co–Conspirator Liability

Hartman, Lysaght, and Kramer first contend that their convictions for RICO conspiracy must be reversed because of the Supreme Court's decision in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), and our decision in *United States v. Viola*, 35 F.3d

---

sion of what was said. It was only when the AUSA and her husband understood the Law Clerk to say that the charge did not correspond to the "script" retained in chambers that the government was for the first time on notice that someone might have altered the transcript. It acted expeditiously thereafter.

Finally, we believe that the principles of waiver are not triggered where courts alter transcripts until a party has reasonable notice of such alteration. Counsel will be understandably reluctant to make a motion claim-

ing that a certified transcript is an altered version of events based on counsel's recollection alone. Indeed, such conduct might be sanctionable. To find a waiver in a reluctance that is perhaps best encouraged would be to condone the practice of altering transcripts without notice to the parties.

12. We note that, under 28 U.S.C. § 332(d)(1), the judicial council can "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit."

37 (2d Cir.1994). Relying upon the district court's statement that they "did not operate or manage, directly or indirectly, the enterprise" in dismissing the substantive RICO violation charged in the indictment, appellants contend that *Reves* precludes a RICO conspiracy conviction for "outsiders" not involved in the operation or management of the enterprise. Alternatively, they contend that a conviction for RICO conspiracy requires a showing that such outsiders knew about and agreed to all the racketeering activity of the enterprise, including racketeering acts in which they were not personally involved. Appellants thus argue that because they did not know the TPBA Officers were accepting bribes from other vendors, they cannot be guilty of RICO conspiracy. We disagree.

Appellants' reading of *Reves* is simply incorrect. *Reves* ruled only that for a defendant to be convicted of a substantive RICO violation under Section 1962(c), the defendant must have taken some part in directing the enterprise's affairs. *See Reves*, 507 U.S. at 179, 113 S.Ct. 1163. No such requirement exists under Section 1962(d), however. *See Salinas*, 118 S.Ct. at 477 ("A person ... may be liable for conspiracy even though he was incapable of committing the substantive offense."); *Napoli v. United States*, 45 F.3d 680, 683– 84 (2d Cir.1995) ("[Defendant] was convicted only on the RICO conspiracy charge, and that conviction is unaffected by the *Reves* error."); *Viola*, 35 F.3d at 43; *see also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 731 (7th Cir.1998) ("[W]e have held that a defendant can be charged un-der § 1962(d) even if he cannot be characterized as an operator. or manager of a RICO enterprise under *Reves* ....").

■■■■ To argue that *Reves* controls the instant case confuses substantive RICO crimes with conspiracy. "A defendant can be guilty of conspiring to violate a law, even if he is not among the class of persons who could commit the crime directly." *Viola*, 35 F.3d at 43. The "straightforward language of § 1962(d) provides: 'It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.'" *Id.* (quoting 18 U.S.C. § 1962(d)). A RICO conspiracy charge "is proven if the defendant 'embraced the objective of the alleged conspiracy,' and agreed to commit ... predicate acts in furtherance thereof." *Id.* (quoting *United States v. Neapolitan*, 791 F.2d 489, 495 (7th Cir.1986)). Assuming that a RICO enterprise exists, the government must prove only "that the defendant[s] ... know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual role[s]." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989). In applying this analysis, we need inquire only whether an alleged conspirator knew what the other conspirators· "were up to" or whether the situation would logically lead an alleged conspirator "to suspect he was part of a larger enterprise." *Viola*, 35 F.3d at 44–45; *see also Salinas*, 118 S.Ct. at 478 (upholding conviction under Section 1962(d) where defendant "knew about and agreed to facilitate the scheme").[13]

---

**13.** When this trial began, it was governed by our ruling in *Viola*. *Viola* held that to prove a violation of 18 U.S.C. § 1962(d), the government must prove that "the defendant 'embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof." 35 F.3d at 43 (quoting *Neapolitan*, 791 F.2d at 495). Accordingly, the indictment thus alleged that each appellant knowingly agreed to join the conspiracy and agreed to commit at least two predicate acts.

During the trial, the Supreme Court ruled in *Salinas* that Section 1962(d) does not re-quire proof that each co-conspirator agreed to commit two predicate acts. *See* 118 S.Ct.. at 478. Nevertheless, the district court instructed the jury on the pre-*Salinas* standard, thus heightening the government's burden beyond what the statute required. The government argues that in addressing appellants' various challenges to their conspiracy conviction, we should follow *Salinas*. We generally agree. We note that doing so does not raise any due process concerns. Because circuits were divided on the proper interpretation of Section 1962(d), the Supreme Court's decision in *Salinas* was sufficiently foreseeable to defeat any

We turn then to appellants' argument that, because the district court, in dismissing the substantive RICO count, stated that appellants did not know of certain acts of the RICO enterprise, reversal of their conspiracy convictions is necessary. However, there is no rule requiring the government to prove that a conspirator knew of all criminal acts by insiders in furtherance of the conspiracy.

No theory requires co-conspirators to have such knowledge. To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy. *See, e.g., Rastelli*, 870 F.2d at 828 ("[T]he government need not prove that a [RICO] conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy."). Accordingly, the district court properly instructed the jury that the government did not have to prove "full knowledge of all the details of the conspiracy" but only that each defendant "was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role." While we have held that too little knowledge may undermine a conspiracy conviction, *see, e.g., Viola*, 35 F.3d at 44–45, there is no requirement that a defendant must have been omniscient.

The evidence easily suffices to support the jury's finding that the appellants were aware of the general nature of the conspiracy. Hartman, Lysaght, and Kramer each knew that the kickback schemes extended beyond themselves individually and involved at least each other, Reale, Zichettello, Montoro, and A & G.

### B. Variance/Multiple Conspiracies

Hartman, Lysaght, and Kramer next argue that their RICO conspiracy convictions should be reversed because the government proved the existence of multiple separate conspiracies in which they played no role and that the jury may well have convicted them based on the prejudicial spillover effect of the evidence of other conspiracies. Thus, they argue that the district court erred in failing to instruct the jury on the multiple conspiracy doctrine. We disagree.

Appellants identify three categories of evidence that, in their view, created a prejudicial variance from the indictment: (i) proof that A & G paid bribes to the TPBA Officers, for which appellants had no responsibility; (ii) evidence of sixteen or more bribery schemes unrelated to appellants in which Zichettello and Montoro participated; and (iii) evidence of forty or more instances of campaign fraud perpetrated on the NYCCFB but unrelated to appellants.

With regard to the A & G bribes, the indictment included racketeering acts and substantive counts against Reale based upon his receipt of kickbacks between 1992 and 1994 from A & G. However, Hartman, Lysaght, and Kramer were not charged in any of the racketeering acts or substantive counts involving A & G. Before trial, Hartman, Lysaght, and Kramer moved to sever Reale from their trial, arguing that the jury's consideration of their guilt would be tainted by proof of Reale's involvement with A & G. *See Reale*, 1997 WL 580778, at *12. The district court denied the motion. *See id.* Over

---

due process challenge to its retroactive application. *See United States v. Rodgers*, 466 U.S. 475, 484, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) ("[A]ny argument ... against retroactive application ... of our present decision ... would be unavailing since the existence of conflicting cases from other Courts of Appeals made review of that issue by this Court ... reasonably foreseeable."); *United States v. Seregos*, 655 F.2d 33, 36 (2d Cir.1981).

However, we also note that because this case was tried as though *Viola* were still the law, the jury's consideration of whether appellants were guilty of conspiring to commit two predicate acts may have been inseparable from its determination that they were guilty of RICO conspiracy. We therefore address *infra* challenges to the government's proof of the commission of predicate acts.

the government's objection, however, the district court granted the application to sever those racketeering acts and counts related to Reale's receipt of bribes from A & G. *See id.* at *13. The government thereafter moved *in limine* to admit evidence of these acts for certain limited purposes. The district court granted the motion on the ground that the evidence was probative.

We see no error in that ruling. The evidence was admitted only to show that A & G had already done some of the work for which LL & K received $750,000 and that, when A & G in turn replaced LL & K in 1992, A & G did so because it, like LL & K, was paying bribes. The evidence was, therefore, relevant to the conspiracy charges against Hartman, Lysaght, and Kramer. Moreover, Hartman, Lysaght, and Kramer themselves introduced much of the evidence concerning A & G's bribes to further their defense that only A & G needed to pay bribes.

As to the evidence of other kickbacks involving Zichettello and Montoro, it is true that both testified to taking kickbacks from vendors and professionals other than Hartman, Lysaght, and Kramer. However, this evidence was relevant to their credibility as government witnesses, and neither Zichettello nor Montoro implicated appellants in any of these additional crimes, a fact of which the jury was well aware. Finally, unlike Hartman, Lysaght and Kramer were not charged with participating in the campaign finance scheme, and the proof relating to Hartman's participation in the scheme was limited to his own conduct, namely, the effort to obtain matching funds and to solicit officers of other organizations to contribute.

Although appellants advance this argument as involving the multiple conspiracy doctrine, it is really a garden-variety claim of unfair prejudice outweighing relevance under Fed.R.Evid. 403. A multiple conspiracy challenge to a conspiracy conviction must be predicated upon a contention that the defendant was found "guilty of membership in a conspiracy other than the one charged." *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988); *see also United States v. Aracri*, 968 F.2d 1512, 1520 (2d Cir.1992). The essence of such a claim is that evidence showing that the defendant played a role in a conspiracy different as a matter of law from the one charged in the indictment wrongly convinced the jury to convict the defendant of the charged conspiracy. *See United States v. Sutherland*, 656 F.2d 1181, 1189–91 & n. 6 (5th Cir. Unit A Sept.1981).

This is not, however, a case in which the jury could plausibly have convicted appellants of a conspiracy other than the one with which they were charged. In the case of the evidence involving the other bribes and campaign fraud described above, the non-involvement of Hartman, Lysaght, and Kramer—save for Hartman's role in the campaign finance scheme—was clear, as were the independent probative purposes of that evidence. Finally, appellants do not challenge the admission of any of this evidence at issue on appeal, and our independent review of the district court's admission of this evidence shows no abuse of discretion.

### C. TPBA Is Not a Statutory Labor Organization

Hartman, Lysaght, and Kramer raise an additional contention aimed solely at their RICO conspiracy convictions. They argue that they were not guilty of one of the predicate acts alleged in the indictment, bribery of a labor official pursuant to N.Y. Penal Law ("NYPL") § 180.15. NYPL § 180.10 defines a labor official as, *inter alia*, "any duly appointed representative of a labor organization." Appellants argue that because the TPBA is excepted from the New York Labor Law as a public sector organization, it does not fall within the Penal Law. We address this issue notwithstanding the *Salinas* decision

holding that a RICO conspiracy conviction need not be based on agreeing to commit two predicate acts. *See supra* note 13 and accompanying text. Obviously, as the case went to the jury, the legality of the payments to the TPBA Officers was of significance to the jury's consideration of whether appellants conspired to violate RICO. However, the payments were in violation of the Penal Law.

Section 715 of the Labor Law states only that

provisions of *this article* shall not apply to: (1) employees of any employer who concedes to and agrees with the board that such employees are subject to and protected by the provisions of the national labor relations act or the federal railway labor act; or (2) employees of the state or of any political civil subdivision or other agency thereof.

N.Y. Lab. Law § 715 (emphasis added). While the TPBA is clearly excluded by Subsection (2) of this provision, the carve-out specifically applies only to "this article," which does not include NYPL § 180. Indeed, under appellants' logic, bribes to officials of organizations within Subsection (1) of N.Y. Lab. Law § 715 would also not be criminalized under NYPL § 180.15—a palpably unreasonable result that would exclude from the prohibition on bribes virtually all officials of all labor unions representing employees in the private sector, which, together with the exclusion of Subsection (2), would exclude almost all, if not all, labor union officials.

2) Prosecutorial Misconduct

A. Perjury and False Evidence

 Hartman, Lysaght, and Kramer claim that the government knowingly admitted perjured testimony regarding the date on which Montoro began accepting bribes from A & G. We disagree.

 Reversal of a conviction based upon allegations of "perjured testimony should be granted only with great caution and in the most extraordinary circum-

stances." *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992); *see also United States v. Moore,* 54 F.3d 92, 99 (2d Cir.1995). Reversal is not justified unless the appellant establishes four matters: (i) the witness actually committed perjury, *see United States v. Helmsley,* 985 F.2d 1202, 1205 (2d Cir.1993); (ii) the alleged perjury was material, *see United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991); (iii) the government knew or should have known of the alleged perjury at time of trial, *see id.;* and (iv) the "perjured testimony remained undisclosed during trial, ..." *United States v. Blair,* 958 F.2d 26, 29 (2d Cir.1992).

Appellants' claim fails because they have not established that Montoro committed perjury. Appellants knew of the purported discrepancy in Montoro's testimony and the evidence offered in support of that testimony. They argued to the jury that their version of when the bribes actually occurred was correct. The jury was thus aware of the dispute and obviously believed Montoro. Appellants having had "ample opportunity to rebut [Montoro's] testimony and undermine his credibility," *Blair,* 958 F.2d at 29, we will not supplant the jury as the "appropriate arbiter of the truth" and "sift[ ] falsehoods from facts," *United States v. Hemmer,* 729 F.2d 10, 17 (1st Cir.1984). The discrepancies in the evidence do not, therefore, establish that the government offered perjured testimony, knowingly or not.

B. *Brady* Violation

 Hartman, Lysaght, and Kramer further contend that the government's failure to turn over certain materials violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Again, we disagree.

 Under *Brady,* "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87, 83 S.Ct. 1194; *see United States v. Zackson,* 6 F.3d

911, 917 (2d Cir.1993). Evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Even if evidence is material and exculpatory, it "is not 'suppressed' " by the government within the meaning of *Brady* "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Zackson*, 6 F.3d at 918 (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982)).

The material the appellants claim was suppressed was a Special Agent's Report that the government initially refused to disclose. However, before the Special Agent testified, the government provided the report to the defense. Appellants were therefore able to use this material, and there is not even a remote possibility that the outcome of the trial would have been affected had they received it earlier. *See United States v. Rivalta*, 925 F.2d 596, 597–98 (2d Cir.1991) (no Brady violation where omission not "sufficient to 'undermine confidence in the outcome' " of trial). We have considered appellants' other contentions concerning the government's alleged suppression of exculpatory evidence and find them to be without merit.

### C. Summation

 Appellants also challenge certain aspects of the government's summation. They failed, however, to object to the summation at trial. Therefore, we will not reverse absent "flagrant abuse." *United States v. Rivera*, 22 F.3d 430, 437 (2d Cir.1994) (quoting *United States v. Ortiz*, 857 F.2d 900, 904 (2d Cir.1988)); *see also United States v. Bautista*, 23 F.3d 726, 732 (2d Cir.1994) (to prevail on claim of prosecutorial misconduct during summation, defendant must demonstrate that the prosecutor's improper remarks caused him "substantial prejudice"); *cf. United*

*States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.").

Hartman's attack on the government's summation regarding the campaign finance scheme rests on the fact that several of the named contributors denied to the grand jury that they were reimbursed for their contributions. In its summation, the government nonetheless contended that they had, in fact, been reimbursed.

Hartman's argument is based on *United States v. Valentine*, in which Valentine was convicted of perjury based upon grand jury testimony in which he denied that he was given a loan to make a political contribution. *See* 820 F.2d 565, 566 (2d Cir. 1987). We reversed because the government argued to the jury, *inter alia*, that "Valentine must have remembered receiving a loan because the other brokers recalled their transactions." *Id.* at 572. In fact, numerous brokers had denied to the grand jury their receiving a loan. *See id.* at 569–70. Moreover, Valentine's counsel was apparently unaware of this grand jury testimony and thus was unable to contradict or object to the government's claims. *See id.* at 571.

The instant case is easily distinguishable from *Valentine*. First, the government did not misrepresent the grand jury testimony. The fact that certain witnesses denied reimbursement before the grand jury does not preclude the government from arguing that Hartman in fact was involved in a scheme to reimburse them and actually did reimburse them. In *Valentine*, the tainted argument falsely suggested that certain persons had admitted to a fact before the grand jury. The government here made no such misrepresentation but simply argued the accuracy of the underlying, albeit contested, facts. Second, Hartman was well aware that the individuals had denied wrongdoing before the grand jury. *See, e.g., Helmsley*, 985 F.2d at

1207–08 (distinguishing *Valentine* and discussing impact of knowledge during trial on subsequent review). Because the government said nothing that misrepresented what these witnesses told the grand jury and Hartman was aware of their testimony, he could easily have objected, and responded, to the government's argument. In *Valentine,* no response was possible because defense counsel was unaware of the grand jury testimony.

We have examined appellants' additional attacks on the government's summation and conclude that they are without merit.

### 3) Bank Records Evidence

■ Hartman, Lysaght, and Kramer contend that admission of their bank records as evidence was an abuse of discretion. However, the district court properly concluded that the records were relevant to show how appellants structured financial transactions to pay bribes. Although evidence as to appellants' wealth was also admitted to some degree through these records, the district court gave a limiting instruction, explaining to the jury that these records in no way shifted the burden to the appellants to "explain or prove the reason for, or the disposition of, this cash." Accordingly, this evidence was not improperly introduced. *See, e.g., United States v. Ebner,* 782 F.2d 1120, 1126 (2d Cir.1986) (upholding admission of evidence against Fed.R.Evid. 403 challenge in light of limiting instructions and "presumption that juries will follow [them]") (quoting *Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981)).

### 4) Disqualification of Lysaght's Attorney

■ Lysaght contends that the district court's decision to disqualify his attorney, Gerald Lefcourt, constitutes reversible error. Lefcourt had at various times provided representation concerning relevant matters to Kramer and Hartman, LL & K, employees at LL & K (one of whom the government expected to call at trial), and

(at the time of the government's motion to disqualify) the insurance business that was the subject of other charges.

■ A district court has "substantial latitude" to require disqualification even where defendants have attempted to waive any potential conflict, and we review such a disqualification only for abuse of discretion. *Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *see also United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993). So long as the district court is correct in finding that the conflict is severe, *i.e.,* "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation," *United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994), it is "obliged" to disqualify the attorney, *id.* In explaining when the conflict is so severe as to mandate disqualification, we have stated that

> there are many situations in which a district court can determine that disqualification of counsel is necessary. The most typical is where the district court finds a potential or actual conflict in the chosen attorney's representation of the accused, either in a multiple representation situation or because of the counsel's prior representation of a witness or co-defendant.

*Locascio,* 6 F.3d at 931 (internal citations omitted).

The district court had an ample basis on which to conclude that the conflicts in the instant matter were severe and hence disqualification was necessary. Indeed, the conflicts might fairly be described as ubiquitous. The decision to disqualify was therefore not an abuse of discretion.

### 5) Sufficiency of the Evidence

Both Lysaght and Hartman raise sufficiency challenges. Lysaght contends that the evidence was insufficient to support his RICO conspiracy conviction. Hartman challenges: (i) the sufficiency of the evidence supporting his convictions on Counts

Eight and Nine, charging wire fraud and wire fraud conspiracy in connection with the campaign finance scheme; and (ii) the jury's special verdict finding that he committed Racketeering Act Four, alleging bribery in connection with the life insurance scheme.

■ "[I]n challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden." *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.1996). The evidence must be viewed " 'in the light most favorable to the government,' drawing all inferences and resolving all issues of credibility in the government's favor." *Id.* (citations omitted); *see also United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997), *cert. denied,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); *United States v. Gordon,* 987 F.2d 902, 906 (2d Cir.1993). Moreover, the evidence must be viewed as a whole, not in isolation. *See United States v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994). If the evidence "suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then [the] conviction must stand." *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir.1995). We address Lysaght's and Hartman's arguments in turn.

■ Lysaght contends that the evidence did not support the jury's finding of his involvement in the two predicate RICO acts alleged: (i) the payment of a $150,000 bribe to obtain $750,000 in legal fees, and (ii) the payment of $18,000 quarterly bribes beginning in 1993. We again disagree.

Lysaght and Kramer were the only partners of LL & K and thus shared the $750,000 equally; Lysaght knew that services of such (or any) value were never provided by LL & K, and his bank records showed structured withdrawals in amounts and methods and at times that connected them to the $150,000 bribe.

As to the $18,000 quarterly payments, Lysaght again directly benefitted from the $2,600 increase in monthly retainer and $200,000 annual payment for labor relations work arranged just as Reale was about to send CLDF work to A & G. When these rearrangements were negotiated, moreover, Lysaght indicated to Montoro his strong intentions to conceal the scheme, evidencing consciousness of guilt regarding the agreement to make quarterly payments. The evidence therefore supported the jury's finding that Lysaght was a member of the conspiracy.

■ As to Hartman, we discuss first his challenge to his wire fraud convictions. To prove wire fraud, the government must establish "1) a scheme or artifice to defraud 2) for the purpose of obtaining money or property . . . and 3) use of [interstate wires] in furtherance of the scheme." *United States v. Slevin,* 106 F.3d 1086, 1089 (2d Cir.1996) (citation omitted) (alteration in original). Although Hartman challenges the sufficiency of proof of his participation in the campaign finance scheme, the evidence regarding the flow of money, the nature of certain contributions, the similar handwriting on certain checks, and Hartman's admission that certain contributors were "mine" provided ample support for the government's theory.

■ Hartman also challenges the sufficiency of the evidence of use of interstate wires. *See* 18 U.S.C. § 1343. It is true that there was no evidence Hartman himself used interstate wires in furtherance of the conspiracy. To sustain the conviction, however, the government need prove only knowledge that a co-conspirator would use the wires in an interstate transmission in furtherance of the conspiracy or that such use of the wires was reasonably foreseeable. *See United States v. Muni,* 668 F.2d 87, 89 (2d Cir.1981) (citing *Pereira v. United States,* 347 U.S. 1, 9–10, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). That test was met in the present case. Facsimiles in furtherance of the campaign finance scheme were sent from New York to New

Jersey by someone in the Reale Campaign. Even if Reale did not personally send these faxes, they were clearly sent by campaign workers on behalf of the Reale Campaign. As long as Reale acted "with knowledge that the use of the [wires] w[ould] follow in the ordinary course of business, or [if] such use c[ould] reasonably [have been] foreseen, even though not actually intended, then he 'caused' the [wires] to be used." *Pereira*, 347 U.S. at 8–9, 74 S.Ct. 358. Because the evidence supports a finding that Reale "caused" the facsimiles to be sent, Hartman, his co-conspirator, is deemed jointly responsible for them. *See United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir.1979) (cited favorably in *United States v. Bortnovsky*, 879 F.2d 30, 37 (2d Cir.1989)).

 Hartman's challenge to the sufficiency of the evidence of Racketeering Act Four under the RICO conspiracy count also fails. There was in fact direct testimony regarding the life-insurance-scheme bribes. That Montoro and Zichettello gave somewhat different accounts of these bribes did not preclude the jury from finding that they occurred.

6) Jury Issues

A. Juror Bias

 Hartman, Lysaght, Kramer, and Reale contend that the district court abused its discretion in refusing to remove Juror IV, who managed a portfolio that included the NYPD's pension fund. We disagree. District courts have broad discretion in deciding whether to replace a juror at any time before the jury retires for deliberation. *See United States v. Purdy*, 144 F.3d 241, 247 (2d Cir.), *cert. denied*, 525 U.S. 1020, 119 S.Ct. 548, 142 L.Ed.2d 455 (1998); *United States v. Agramonte*, 980 F.2d 847, 850 (2d Cir. 1992). Indeed, the district court is in "the best position to evaluate the juror's demeanor and to determine ... whether the juror could fairly and impartially hear the case." *United States v. Garcia*, 936 F.2d 648, 653 (2d Cir.1991) (quoting *United*

*States v. Ploof*, 464 F.2d 116, 118 (2d Cir. 1972)).

The district court, following an examination of this juror, found that he could be impartial. We see no error in that finding and determine the evidence in the record to be sufficient, on its own, to place the district court's decision not to replace the juror within its broad discretion.

B. Prejudicial Publicity

 Reale also contends that the district court abused its discretion by refusing to question jurors about and give an appropriate instruction regarding a television story about violence committed against a witness, possibly under Reale's orders. When a trial court determines that media coverage has the "potential for unfair prejudice," it is obligated to "canvass the jury to find out if they have learned of the potentially prejudicial publicity" and, if necessary, voir dire the jury to "ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly." *United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir.1987).

The district court's conduct here was sufficient to determine that the jury was not prejudiced. The very same story had appeared a day earlier in a newspaper, and the district court had then inquired of each juror whether they had seen the report, instructed them not to watch or read anything about the case, and told them to inform her if they did encounter any coverage. No juror later mentioned seeing the television report, and the district court's decision not to inquire further was well within her discretion. *See United States v. McDonough*, 56 F.3d 381, 386–87 (2d Cir. 1995) (jurors are presumed to follow instructions); *United States v. Casamento*, 887 F.2d 1141, 1154–55 (2d Cir.1989) (same).

7) Sentencing

A. Hartman & Reale

 Hartman challenges his sentence on the ground that the district court im-

properly calculated the amount of loss attributable to the life insurance and campaign finance schemes. Specifically, Hartman contends that including the disputed $100,000 insurance bribe in the calculation was error because the district court struck the alleged predicate act based on this bribe. However, we disagree. Even though the district court struck the predicate act, the jury in its verdict sheet nevertheless found that the government had proved its occurrence beyond a reasonable doubt. Moreover, even if the jury had not made such a finding, the district court was free to include the bribe in the loss calculation on the basis of the trial evidence. *See United States v. Reese*, 33 F.3d 166, 174 (2d Cir.1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal."); *see also United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (at sentencing, even "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge").

▪ As to the campaign finance scheme, Hartman is liable as a co-conspirator for "all reasonably foreseeable acts and omissions" in furtherance of the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B). Because there was evidence that Hartman was well aware of the larger scheme, the district court did not err in finding that Hartman was liable for the entire loss suffered by the NYCCFB.

▪ Hartman and Reale also contend that the four-level enhancement they received for their roles in the various schemes was improper. *See* U.S.S.G. § 3B1.1(a).[14] "The sentencing court's findings as to the defendant's role in the of-

fense will be overturned only if they are clearly erroneous." *United States v. Farah*, 991 F.2d 1065, 1068 (2d Cir.1993). Contrary to Hartman and Reale's contentions, they are subject to the enhancement even if they each managed only one other participant, not five. *See* U.S.S.G. § 3B1.1, Application Note 2; *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir.1995). As to both appellants, the district court adopted the factual findings of the Presentence Report, which provided an ample basis to support the enhancements. *See United States v. Escotto*, 121 F.3d 81, 85–86 (2d Cir.1997), *cert. denied*, 522 U.S. 1060, 118 S.Ct. 720, 139 L.Ed.2d 660 (1998).

### B. Richardone

Richardone contends that he was entitled to a three-level reduction for acceptance of responsibility and that his two-level role enhancement was improper.

▪ As to acceptance of responsibility, the failure to pay restitution as promised can constitute a refusal to accept responsibility. *Cf. United States v. Harris*, 38 F.3d 95, 98 (2d Cir.1994) (noting appellant's failure to pay promised restitution in affirming sentence). *See generally United States v. Wells*, 154 F.3d 412, 414 (7th Cir.1998) (even when defendant pleads guilty, refusal to pay restitution demonstrates "a desire to retain the fruits of the crime, [and thus] blocks any inference of remorse or repentance"). Richardone had available to him $80,000 from his pension and failed to give an adequate explanation for not making a promised $19,100 restitution payment. The district court's refusal to find an acceptance of responsibility was therefore not clearly erroneous even though Richardone pleaded guilty.

---

14. The pertinent provision reads as follows:
 Based on the defendant's role in the offense, increase the offense level as follows:
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.... U.S.S.G. § 3B1.1(a).

■ Although a closer question, we also reject Richardone's second challenge to his sentence. Richardone pleaded guilty to a count alleging participation in a mail fraud scheme. The scheme involved Richardone's paying false invoices to a car dealer who leased cars to the TPBA. The dealer in turn provided cars to Richardone and Zichettello. The dealer also sold cars at large discounts to members of the TPBA selected by Richardone and to Richardone's family and friends. Richardone received a two-level enhancement for his role based on a finding that he was "an organizer, leader, manager, or supervisor in any criminal activity ..." U.S.S.G. § 3B1.1(c); *see also United States v. Djelevic*, 161 F.3d 104, 106 n. 3 (2d Cir.1998) ("Section 3B1.1(c) provides for a two-level enhancement if the criminal activity involves [fewer] than five participants."). There is no dispute that selected TPBA members and Richardone's friends and relatives were able to buy cars at discounted prices from the auto dealer as a direct result of Richardone's larceny from the TPBA.

The issue is whether any of the selected TPBA members or Richardone's family and friends who benefitted may be considered a "participant" in Richardone's offense for purposes of the Sentencing Guidelines. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement officer) is not a participant." U.S.S.G. § 3B1.1, Application Note 1.

We held in *United States v. Melendez*, 41 F.3d 797 (2d Cir.1994), that individuals who had received stolen money from a defendant could not be deemed "participants" because none of the individuals were "alleged to have been involved with the crime to which [defendant] pleaded guilty; rather, they were convicted of receiving stolen property." *Id.* at 800. Because there was *"no evidence* that the ...

individuals had *advance knowledge* of the theft, much less participated in its planning or execution[,] ... [and] the record [does not] indicate that they *expected to receive the proceeds* of the theft[,] .... [they] cannot be considered participants for purposes of § 3B1.1(a)." *Id.* (emphasis added) (citing *United States v. Colletti*, 984 F.2d 1339, 1346 (3d Cir.1992) (holding that receiver of stolen property is not deemed participant in theft where robbery was completed before receiver became involved in any way, or even became aware of criminal enterprise)).

■ *Melendez* is distinguishable from the instant matter. The individuals whom the district court determined were "participants" in Richardone's scheme were other TPBA officers and Richardone's family and friends. Unlike the recipients of stolen property in both *Melendez* and *Colletti*, the district court had an evidentiary basis to conclude that at least one of these individuals was criminally involved in Richardone's scheme. For example, the TPBA Recording Secretary was allowed to purchase a new vehicle at an 80% discount. The purchase was clearly part of the ongoing criminal scheme to which Richardone pleaded guilty. The Recording Secretary had to have known from the size of the discount that some illegitimate *quid pro quo* involving the TPBA Treasurer was the catalyst for the transaction. We review the district court's factual findings for clear error, *see United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir.1995); *United States v. Mortimer*, 52 F.3d 429, 437 (2d Cir.1995), and under that standard the uncontested facts are sufficient to render the TPBA Recording Secretary a participant and to justify the enhancement. We thus need not address the issue with regard to Richardone's friends and family.

## CONCLUSION

We therefore affirm. Pursuant to Rule 10(e)(2), we hereby correct the record and

certify that the aiding and abetting portion of the jury charge shall conform to the Court Reporter's Charge as set forth in *infra* note 15 and shall not contain the additions made by the district court subsequent to trial.[15]

15. The relevant aiding and abetting portion of the Official Transcript—that portion which appears in the Official Revised Charge beginning at page 6154 line 22 and ending on page 6156 at line 17—shall be amended to read as follows:

Now, in connection with the racketeering acts I have just discussed, defendants Hartman, Lysaght and Kramer are also charged with aiding and abetting the commission of those crimes. The aiding and abetting statute, Section 2(a) of Title 18 of the United States Code, provides that:
"Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."
In other words, it is not necessary for the government to show that a defendant himself conferred, offered or agreed to confer a bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a defendant actually committed the crime of bribery, you may still find the defendant guilty of that crime as an aider or abettor.
A person who aids, abets, counsels or induces another person to commit an offense is just as guilty of that offense as if he had committed it himself.
Accordingly, you may find a particular defendant guilty of the substantive crime if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, and that the defendant aided, abetted, counseled, or induced that person or persons in the commission of the offense.
You may also find the person guilty of the crime of conspiracy if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, and that the defendant aided, abetted, counseled or induced that person or persons in the commission of the offense.
As you can see, the first requirement is that another person has committed the crime charged. Obviously, no one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place. But if you do find that a crime was committed, then you must consider whether the defendant you are considering aided and abetted, or commanded, the commission of the crime.
In order to aid or abet another to commit a crime, it is necessary that a defendant willfully and knowingly associate himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed. Participation in a crime is willful if action is taken voluntarily and intentionally; that is to say, with a bad purpose either to disobey or to disregard the law.

## APPENDIX A—Binder Charge

On the other hand, if you find that the Government has failed to your satisfaction beyond a reasonable doubt any one or more of these five elements, then you should not find the Defendant you are considering conspired to commit the Racketeering Act in question.

### AIDING AND ABETTING

In connection with the Racketeering Acts I have just discussed, Defendants HARTMAN, LYSAGHT and KRAMER, are also charged with aiding and abetting the [conspiracy to commit commission of] those crimes. The aiding and abetting statute, section 2(a) of Title 18 of the United States Code, provides that:

"Whoever conspires to commit/commits an offense against the United States or aids, abets, counsels, commands, induces or procures [its commission] [is in the conspiracy to commit punishable as a principal."

In other words, it is not necessary for the Government to show that a Defendant himself conspired to confer/conferred offered or agreed to confer a bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a Defendant actually conspired to commit/committed the crime of bribery, you may still find the Defendant guilty of that crime as an aider or abettor.

A person who aids, abets, counsels or induces another person conspire or to commit an offense is just as guilty of that offense as if he had conspired or committed committed it himself.

Accordingly, you may find a particular Defendant guilty ~~of the substantive crime~~ if you find, beyond a reasonable doubt, that the Government has proved that another person or persons actually committed the crime, *or conspired to commit the crime* and that the Defendant aided, abetted, counseled or induced that person or persons in the ~~commission of~~ *conspiracy to commit* the offense.

As you can see, the first requirement is that another person has committed *or conspired to commit* the crime charged. Obviously, no one can be convicted of aiding and abetting the ~~criminal acts~~ *conspiracy to commit of others if* ~~of another if no there was no conspiracy to commit the crime crime was committed~~ by the other person in the first place. But if *conspiracy to commit a crime existed* you do find that a ~~crime was committed~~, then you must consider whether the Defendant you are considering aided and abetted, ~~or commanded, the commission of the crime.~~ *A that conspiracy.*

*in a conspiracy*

In order to aid or abet another to commit a crime, it is necessary that a Defendant wilfully and knowingly associate himself in some way with the ~~crime~~ *conspiracy*, and that he wilfully and knowingly seek by some act to help make the ~~crime~~ *conspiracy* succeed. Participation in a ~~crime~~ *conspiracy* is wilful if action is taken voluntarily and intentionally; that is to say, with a bad purpose either to disobey or to disregard the law.

**112**

## APPENDIX B—Revised Charge

81mdrea3 6154

~~Now,~~ In connection with the racketeering acts I have just discussed, defendants Hartman, Lysaght and Kramer are also charged with aiding and abetting the commission of those crimes. The aiding and abetting statute, Section 2(a)

81mdrea3 6155
CHARGE

of Title 18 of the United States Code, provides that:

"Whoever conspires to commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission in the conspiracy to commit is punishable as a principal."

In other words, it is not necessary for the government to show that a defendant himself conspired to conferred, offered or agreed to confer a bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a defendant actually conspired to committed the crime of bribery, you may still find the defendant guilty of that crime as an aider or abettor.

A person who aids, abets, counsels or induces another person to conspire or commit an offense is just as guilty of that offense as if he had conspired or committed it himself.

Accordingly, you may find a particular defendant guilty of the substantive crime if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, or conspired to commit the crime, and that the defendant aided, abetted, counseled, or induced that person or persons in the conspiracy to commit the commission of the offense.

You may also find the person guilty of the crime of conspiracy if you find, beyond a reasonable doubt, that the government has proved that another person or persons actually committed the crime, and that the defendant aided, abetted, counseled or induced that person or persons in the

**114**

commission of the offense.

As you can see, the first requirement is that
*or conspired to commit\*
another person has committed /\the crime charged. Obviously,
*see pg 70*
no one can be convicted of aiding and abetting /the criminal

acts of another if no crime was committed by the other

person in the first place. But if you do find that a crime

was committed, then you must consider whether the defendant

you are considering aided and abetted, or commanded, the

commission of the crime.
*in a conspiracy*
In order to aid or abet another /\to commit a

crime, it is necessary that a defendant willfully and
*conspiracy*
knowingly associate himself in some way with the ~~crime~~, and

that he willfully and knowingly seek by some act to help
*conspiracy* *Conspiracy*
make the ~~crime~~ succeed. Participation in a ~~crime~~ is willful

if action is taken voluntarily and intentionally; that is to

say, with a bad purpose either to disobey or to disregard

the law.

APPENDIX C—Laptop Notes

January 22, 1998

UNITED STATES V REALE ET AL

JURY CHARGE 11:55 AM - 12:40 PM

 REDACTED

CHARGE RESUMED 12:55 PM - 1:58 PM

CHARGE RESUMED 2:10 PM - 3:00 PM

Lunch break!

CHARGE RESUMED 3:50 PM -

I have it out with RRA that the aiding and abetting charge is not rigiht since it deals with substantive crimes and not conspiracy. Regardless of what was submitted by the Govt., it is our final responsibility to make sure that the charge is correct. I am not happy about this. Let us see if the Govt. Or defense says anything about the errors at the exceptions part of the end of the charge!

REDACTED

## APPENDIX D—Law Clerk's Handwritten
## Proposed Revision

①

In connection with the Racketeering Acts I have just discussed, Defendants Hartman, Lysaght and Kramer are also charged with Aiding and Abetting the Conspiracy to commit those crimes.

The Aiding and Abetting statute, Section 2(a) of Title 18 of the United States Code, provides that:

"Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal"

In other words, it is not necessary for the Government to show that a defendant himself conspired to confer, offer or agree to confer a

② bribe in order for you to find him guilty. Under this statute, if you do not find beyond a reasonable doubt that a Defendant actually conspired to commit the crime of bribery, you may still find the Defendant guilty of that crime as an aider or abettor.

A person who aids, abets, counsels or induces another person to conspire to commit an offense is just as guilty of that offense as if he ~~committed it himself~~ had conspired or committed ~~the~~ it himself.

Accordingly, you may a particular Defendant guilty if you find, beyond a reasonable doubt, that the Government has proved that another person or person conspired to commit the crime and that

(3)

the Defendant aided, abetted, counseled or induced that person or persons in the conspiracy to commit the offense.

As you can see, the first requirement is that another person has conspired to commit the crime charged. Obviously, no one can be convicted of aiding and abetting the commission of a conspiracy if there was no conspiracy to commit the crime by the other person or persons in the first place. But if you do find that a conspiracy to commit a crime existed, then you must consider whether the Defendant you are considering aided and abetted that conspiracy.

④

In order to aid or abet another in a conspiracy to commit a crime, it is necessary that a Defendant willfully and knowingly associate himself in some way with the conspiracy, and that he wilfully and knowingly

OAKES, Senior Circuit Judge, dissenting:

I dissent despite the tremendous effort of the panel majority in attempting to fathom what is, to me, an almost unfathomable record. I do so not because I disagree with the interpretation of Federal Rule of Appellate Procedure ("F.R.A.P.") 10 that the district court's reconstruction of the record may be corrected only if it is "plainly unreasonable."

This is true even though that language originated and has been perpetuated in cases uniformly upholding, rather than abrogating as the majority does here, a district court's reconstruction. *See, e.g., United States v. Keskey,* 863 F.2d 474, 478 (7th Cir.1988)(accepting district court's reconstruction of the record under F.R.A.P. 10(e) unless "intentionally falsified" or "plainly unreasonable."); *see also Rogan v. Menino,* 175 F.3d 75, 79–80 (1st Cir.

1999) (applying the standard to F.R.A.P. 10(c)); *Barilaro v. Consolidated Rail Corp.*, 876 F.2d 260, 263–64 (1st Cir.1989) (same); *United States v. Mori*, 444 F.2d 240, 246 (5th Cir.1971). I dissent because a sensible application of this doctrine requires us to accept the district court's reconstruction of the record where, as here, the challenge to the record was raised at too late a time without an adequate explanation for the delay.

In the instant case, the charge was delivered to the jury on January 22, 1998. After a process of editing by the district court, the charge that contained the critical interlineations that appellants challenge on appeal was returned to the court reporter. This version, the so-called "Official Revised Charge," was released to the parties in March of 1998. *See* Neiman Aff. ¶ 54. When the government and defense counsel received this version of the charge, neither party claimed that it inaccurately reflected what was read to the jury at trial. On appeal, appellants argued that the language contained in the charge was improper and, consequently, the conspiracy convictions should not stand. The government proceeded to answer the appellants' brief on the basis that the Official Revised Charge was read to the jury. At no point in its brief did the government state that the challenged language was different from that read to the jury. Not until after the government's appellate brief was filed and an AUSA on the case had a discussion with the district court judge's former law clerk at a social event did the government set about to check on the questioned language. *See* Neiman Aff. ¶ 55, n. 18. Although "the government acknowledges that it would have been possible to investigate the matter of whether the challenged language was ever given" earlier than April 1999, the only explanation in the record for the lapse is: "To be sure, the AUSAs who were present at trial did not recall, more than a year later, the language being delivered, nor did they think that they would have failed to notice

the deviations from the 1/12/98 Draft Charge." *Id.*

I agree with the Fifth Circuit's view in *Buckelew v. United States*, 575 F.2d 515, 520 (5th Cir.1978), that "[t]he procedural default rule has especially clear application to claims of incomplete records, it being appellate counsel's first duty to settle the record." That court accurately set forth my view when it stated:

> [w]hen appellants attack the validity of the record in this case, they seek to undermine the administration of appellate justice—justice that depends upon the crucial assumption that records and transcripts are accurate reflections of the facts pertinent to the issues on review. Moreover, we discern nothing unfair about requiring that the adequacy of the record be challenged in accordance with Rule 10(e), so that the matter can be resolved at a time, *soon after trial,* when the statements and conduct of the trial participants are still fresh in the minds of any bystanders who might be called on for evidence and appellate review can be conducted on an honest record. Doing otherwise converts direct appeal into a farce.

*Id.* at 520 (emphasis added).

Here, the government should have moved to correct the record in March of 1998 when it first received the "Official Revised Charge" that contained language the government now claims was never read to the jury. Even accepting the government's excuse that it had no reason to question the charge at that point, when a notice of appeal was filed and the parties compiled the record on appeal, the government should have set about fulfilling its duty as appellate counsel to insure the record on appeal was accurate. Finally, there is simply no excuse whatsoever for the government's failure to examine the record after appellants' brief was filed and before the government filed its response. It is hard to believe that bells did not go off for any of the AUSAs after reading the appellants' brief that centered an argu-

ment around the disputed language. Indeed, a close reading of the Pearce Affidavit supports the conclusion that at least one AUSA who had been present in the district court when the charge was read suspected an inconsistency between the instruction as it was set forth in the appellants' brief and as it was read at trial *before* she was tipped off by the district court's former law clerk. *See* Pearce Aff. ¶ 3 (recalling that AUSA Hirshman brought her suspicion of a discrepancy up to the former law clerk before the law clerk mentioned his own suspicion).

In light of the foregoing, I am not convinced that the government did not waive its F.R.A.P. 10(e) argument. In *U.S. v. Quiroz*, 22 F.3d 489, 490–91 (2d Cir.1994) (*per curiam*), the government petitioned for a rehearing of our decision that the district court had wrongly denied the defendant's motion to suppress post-arrest statements. The government's petition was based on its discovery, made after our decision was rendered, that the appeal had been decided on a mistaken record and that the defendant had, in fact, waived his right to object to the admission of the statements. *See id.* at 490. In *Quiroz*, we reasoned that where counsel, whose name was on the appellate brief, was present in the courtroom when the defendant failed to object and "the transcript showing objection by [the defendant] was in error," counsel should have known it. *See id.* In such a situation we concluded there is "no excuse for the government's failure to assert in a *timely fashion* that [defendant] had failed to preserve his objection." *See id.* We therefore ruled that the government could not obtain a rehearing of the appeal based on the true record because the government had waived its waiver argument by failing to raise it on appeal. *See id.* at 491.

In this case, as in *Quiroz*, a number of AUSAs on the appellate brief were also present in the district court when the jury instructions were read. The same AUSAs received a copy of the "Revised Official Version" of the instructions that contained the disputed language shortly thereafter and were alerted to the possible inconsistency again when the appellants' brief was filed. Under *Quiroz*, the explanation set forth by the government in this case—that the AUSAs simply did not remember—is no excuse for its failure to assert in a timely fashion that the jury instruction was not correctly set forth in the record. Ordinarily, failure to include an argument in the appellate brief waives the argument on appeal. *See Frank v. United States*, 78 F.3d 815, 832–33 (2d Cir.1996); *Quiroz*, 22 F.3d at 490; *United States v. Babwah*, 972 F.2d 30, 34 (2d Cir.1992).

Even if, as the majority suggests, all of the elements of a knowing waiver are not met here, my opinion rests on the principle of institutional integrity. It was sixteen months after the delivery of the charge to the jury and approximately a year after the disputed version of the charge was returned to the parties that anyone sought to correct the record. That is precisely the problem that I have with this case. Sixteen months after the fact, no one's mind can freshly recall what actually happened at trial. Because no one attempted to correct the record for so long, we are forced on appeal to reconstruct the record based on conflicting accounts and foggy memory, with the result of casting aspersions on the district court.

While it is the district court judge's "belief" that the Official Revised Charge properly recorded the charge as actually given at trial, there is considerable evidence recounted in the majority opinion that the trial judge's belief was mistaken.

Where a correction of substance is mistaken and the court reporter or transmitter does not see it, it is the better rule to require appellate counsel to move promptly for correction after the revised version is submitted to them. The record should be corrected promptly in the trial court or at the earliest possible point in the appellate court. Under the circumstances of this case, where there is no explanation for

the delay, this Court should not undertake the Herculean task of determining what actually happened at trial when over a year has passed before it is brought to a court's attention. Of course, it makes no difference whether it is the appellees or appellants who seek to correct the record. This Court simply should not be faced with the task of sorting through a record that contains such an embarrassing administrative snarl with the aid of hazy and contradicting recollections.

I would therefore have treated the Official Revised Charge as our record on appeal, denied the Government's motion, reversed and remanded on the conspiracy convictions, but affirmed on the remaining convictions.